UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DIANE PAYSON and LAURIE TYLER,

                    Plaintiffs,

      -against-

BOARD OF EDUCATION OF MOUNT PLEASANT
COTTAGE SCHOOL, USFD; JAMES GAUDETTE,
SUPERINTENDENT OF MOUNT PLEASANT
COTTAGE SCHOOL USFD, IN HIS OFFICIAL
AND INDIVIDUAL CAPACITY; MONICA BARON,
PRINCIPAL OF MOUNT PLEASANT COTTAGE
SCHOOL, IN HER OFFICIAL AND INDIVIDUAL
CAPACITY,

                    Defendants.
--------------------------------------------------------X

**OPINION AND ORDER**

14 Civ. 9696 (JCM)

     Plaintiffs Diane Payson ("Payson") and Laurie Tyler ("Tyler") (collectively, "Plaintiffs")

commenced this action against Defendants Board of Education of Mount Pleasant Cottage

School Union Free School District ("BOE"); James Gaudette ("Gaudette"), Superintendent of

Mount Pleasant Cottage School Union Free School District, in his official and individual

capacity; and Monica Baron ("Baron"), Principal of Mount Pleasant Cottage School Union Free

School District, in her official and individual capacity (collectively, "Defendants"). (*See* FAC[1]

¶¶ 7-8, 11-13). Plaintiffs claim that Defendants (i) violated their First Amendment rights to

speak out on matters of public concern, pursuant to 42 U.S.C. § 1983 ("Section 1983"); (ii)

violated their First Amendment rights to associate with and advocate on behalf of the Mount

Pleasant Cottage School Teachers' Union (the "Union") and its members;[2] and (iii) retaliated

---

[1] Refers to Plaintiffs' first amended complaint ("FAC") filed in this action on February 19, 2016. (Docket No. 31).

[2] Plaintiffs' claims as listed in the FAC do not specify the manner in which their First Amendment rights were allegedly violated. (*See* Payson's and Tyler's second and third claims, FAC at 19-20, 22). However, it is clear that Plaintiffs intend to allege First Amendment retaliation claims, and the Court therefore construes them as such. (*See* FAC ¶ 2; Docket No. 59 ("Pl. Br.") at 8). Additionally, Plaintiffs do not specify that their First Amendment claims

against them in violation of the Rehabilitation Act (the "Rehabilitation Act" or "Act"), 29 U.S.C. § 794 *et seq.* (FAC ¶¶ 1, 108-20, 124-36). Payson brings an additional claim for retaliation pursuant to New York Civil Service Law § 75-b ("Section 75-b"). (FAC ¶¶ 121-23). Before the Court is Defendants' motion for summary judgment ("Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure.[3] (Docket Nos. 49-53, 60). Plaintiffs oppose the Motion. (Docket Nos. 56-59).[4] For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## I. BACKGROUND

### A. Facts

The following facts are gathered from the parties' statements filed pursuant to Local Civil Rule 56.1 ("Rule 56.1") of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and pleadings, affidavits, declarations and exhibits submitted by the parties in support of their contentions. (Docket Nos. 52-1, 57, 58).[5] Any factual disputes are noted, and the facts are construed in the light most favorable to Plaintiffs as the parties opposing summary judgment.

### 1. Background

The Mount Pleasant Cottage School Union Free School District ("District") is classified as a Special Act School District, which generally means that it serves students who receive

---

related to Union activity are brought pursuant to 42 U.S.C. § 1983, but the Court treats them as such. (*Compare* FAC ¶ 1, *with* Payson's and Tyler's third claims, FAC at 20, 22).

[3] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c), and Federal Rule of Civil Procedure 73. (Docket No. 43).

[4] The parties' briefs and supporting papers are hereinafter referred to as "Def. Br.," "Pl. Br.," and "Def. Reply," respectively. (Docket Nos. 51, 59, 60). All page number citations refer to the page number assigned upon electronic filing.

[5] The parties' Rule 56.1 statements are hereinafter referred to as "Def. Statement," "Pl. Resp. to Statement," and "Pl. Counterstatement," respectively. (Docket Nos. 52-1, 57, 58).

special education services. (Tyler Dep.[6] at 36; Gaudette Dep.[7] at 10-17).  Many of the District's

students are emotionally disabled, developmentally delayed, or have learning disabilities. (Tyler

Dep. at 36; Gaudette Dep. at 12-15).  The District consists of two schools, Pleasantville Cottage

School ("PCS") and Edenwald School ("Edenwald"), and also includes a residential center, the

Jewish Child Care Association ("JCCA"). (Tyler Dep. at 35; Gaudette Dep. at 13-15, 20).  PCS

serves primarily behaviorally and emotionally challenged students, while Edenwald is mainly for

developmentally disabled students. (Tyler Dep. at 35).

Payson was a school counselor and Tyler is a special education teacher in the District.

The BOE is the governing and policy-making body of the District. (FAC ¶ 11).  Gaudette has

been Superintendent of the District since July 2011. (Gaudette Dep. at 18; Payson Dep.[8] at 66).

Baron served as the Director of Pupil Personnel Services ("PPS") and Individualized Education

Plan ("IEP") Coordinator during the 2012-2013 school year. (Baron Dep.[9] at 13-15; Gaudette

Dep. at 45).  She later became the principal of PCS, and in that capacity she supervised Payson

and Tyler. (Baron Dep. at 15, 84, 187).  Teachers and counselors, including Payson and Tyler,

were members of the Union, while superintendents and principals, including Gaudette and

Baron, were not. (Tyler Dep. at 39-40).

---

[6] Refers to the deposition of Tyler taken in this action, originally attached to the Declaration of Jennaydra D. Clunis ("Clunis Decl.") (Docket No. 50) as Exhibit ("Ex.") P, and thereafter filed as Docket No. 64.  All page number citations refer to the transcript filed as Docket No. 64.

[7] Refers to the deposition of Gaudette taken in this action, originally filed as Clunis Decl. Ex. C, and thereafter filed as Docket No. 63.  All page number citations refer to the transcript filed as Docket No. 63.

[8] Refers to the deposition of Payson taken in this action, originally filed as Clunis Decl. Ex. A, and thereafter filed as Docket No. 62.  All page number citations refer to the transcript filed as Docket No. 62.

[9] Refers to the deposition of Baron taken in this action, originally filed as Clunis Decl. Ex. D, and thereafter filed as Docket No. 61.  All page number citations refer to the transcript filed as Docket No. 61.

## 2. Payson

Payson was hired by the District as a school counselor in April 2003, and was appointed tenure in September 2006. (Payson Dep. at 7, 11). In September 2011, after Gaudette became superintendent, Payson began serving as the District guidance counselor. (Payson Dep. at 14-21). Her responsibilities as District guidance counselor included overseeing the District's guidance program, transitioning from a paper to a computerized schedule for each student in the District, ensuring that students were in the correct classes, making sure that students' grade levels were accurate, recommending which New York State tests students should take, determining promotional criteria, and providing transitional planning for students after they finished high school. (*Id.*). The following year, in October 2012, Payson coordinated the Ease of Entry program, which was designed to assess the proper academic placement for students who were new to the District. (*Id.* at 83-84; Gaudette Dep. at 41-42). At that time, Payson also became the District test coordinator, was in charge of a newly-created general education development ("GED") program, and was the guidance counselor at PCS. (Payson Dep. at 100, 128-32). However, she no longer served as the District guidance counselor. (*Id.*). During the spring of that school year, in March 2013, Gaudette wrote a letter recommending Payson for the Future School Leaders Academy ("FSLA"), a program at Bank Street College Graduate School of Education ("Bank Street") that is designed for "aspiring administrators." (Gaudette Dep. at 57-60; Pl. Ex.[10] 24). Gaudette wrote that Payson had his "full, unwavering recommendation." (Pl. Ex. 24). As part of Payson's FSLA internship, she performed additional District-wide tasks, including researching a scheduling management system, which Gaudette asked her to do in

---

[10] Refers to exhibits attached to the Affidavit of Jane Bilus Gould (hereinafter, "Gould Aff."). (Docket No. 56).

August 2013, and also performed building-level activities. (Gaudette Dep. at 55-57, 63-66; Pl. Ex. 23).

Payson's advocacy on behalf of students began in the fall of the 2013-2014 school year and continued through that spring, as will be discussed *infra* Section I(A)(2)(i). In November 2013, Payson's workload increased. (Gaudette Dep. at 87-90). For example, she was assigned around fifteen additional non-mandated counseling students, and Gaudette asked her to develop a system to determine how to place students. (*Id.*). In February 2014, Payson was tasked with additional work.[11] (Payson Dep. at 240; Gaudette Dep. at 102-07). Payson wrote to Gaudette in March 2014 regarding her responsibilities and asking for support. (Def. Ex.[12] I). As will be discussed in more detail *infra* Section I(A)(2)(iii), in May 2014, Payson's position was reduced to 0.15 full time equivalent ("FTE"), and in September 2014, her position was eliminated. (Def. Exs. K, L, M).

### i. Advocacy on Behalf of Students

In September 2013, Gaudette changed the class model for students in the District. (Payson Dep. at 170-71). Rather than remain in one self-contained class for the duration of each day, a rotational program was introduced, in which students switched classes for each subject area. (*Id.*). In addition, while one counselor used to be assigned to each class, under the new program, students were assigned to counselors at random. (*Id.*). Payson voiced her concern about this new model. She told Gaudette that she did not think all of the students were capable of rotating classes, based on their disabilities, and that some students would be better served by remaining in self-contained classes. (Gaudette Dep. at 71-72; Payson Dep. at 170-72). She also

---

[11] As will be discussed *infra* Section I(A)(2)(iii), the parties dispute the nature of this work.

[12] Refers to exhibits attached to Clunis Decl.

expressed her concern regarding the students' "random[]" reassignment to counselors, instead of having one counselor per self-contained class. (*Id.*). Payson advocated against this new program on more than one occasion. (Payson Dep. at 172-74).

Payson advocated on behalf of students at several other points during the 2013-2014 school year. For example, she generally spoke to Baron about students whom she believed had been placed at the wrong grade level.[13] (Payson Dep. at 177). In addition, she advocated for two students whom she thought had been placed at the wrong school. In October of 2013, she told Baron that she did not think a particular student, "K.J.," should be placed at PCS, but should instead be placed at Edenwald. (Baron Dep. at 224-29; Pl. Ex. 76). Payson also filed a complaint with the State Education Department of The University of the State of New York ("New York State Education Department" or "NYSED") concerning K.J.[14] (Def. Ex. S). In addition, Payson told Baron that a new student, whom Payson had assessed, should be placed at Edenwald, but the student was instead sent between the two schools, until "her mother pulled her out." (Payson Dep. at 188-89).

Also in the fall of 2013, Payson advocated to Gaudette on behalf of a student named "J.J.," who had failed eighth grade and had been on long term suspension. (Payson Dep. at 177-78; Gaudette Dep. at 99-102). There had been a "legal incident" between J.J. and a teacher, after which J.J. was not allowed to return to class or be in close proximity to the teacher. (Gaudette Dep. at 99-102; Def. Ex. T). While he was suspended, J.J. went to Payson and requested that she give him work to do during his suspension so that he did not have to repeat eighth grade. (Payson Dep. at 177-78). Payson asked Gaudette whether she could give him

---

[13] Gaudette claims that he first learned that Payson was upset about certain students' grade assignments in 2014. (Gaudette Dep. at 84-85, 92, 97).

[14] It appears that NYSED did not investigate the allegation because K.J. had been discharged home and was no longer attending school in the District. (Def. Ex. R).

work, and Gaudette responded that the student could not be in the building. (*Id.*). In January of that school year, J.J. was placed in ninth grade, without completing the prerequisite classes. (*Id.*; Def. Ex. T). Payson filed a complaint with the NYSED about this incident in or around June 2014. (Pl. Ex. 48). In the complaint, she alleged that J.J. was denied access to the school from September 2013 until November 2013, and that he was promoted from eighth to ninth grade in January 2014, which denied him the full range of opportunities both for eighth and ninth grade. (*Id.*). Gaudette became aware of the complaint in June or July 2014, and the NYSED sustained both allegations on August 8, 2014. (Gaudette Dep. at 218-21; Pl. Ex. 48).

In March 2014, Payson advocated to Baron and Gaudette regarding a student, "M.M." (Payson Dep. at 179-84). M.M.'s sixth grade class had been collapsed, and M.M. was placed in eighth grade, without having had access to the seventh grade curriculum. (*Id.*). Moreover, Payson noted that there was more than a three-year age gap between M.M. and the eighth grade students, which she claimed was against New York state law. (*Id.*). Payson filed a complaint with the NYSED regarding these issues in or around June 2014, and Gaudette became aware of the complaint in June or July 2014.[15] (Gaudette Dep. at 218; Pl. Ex. 47). In a decision rendered on August 1, 2014, the NYSED did not sustain Payson's allegation regarding M.M.'s move from sixth to eighth grade, but did sustain her allegation that M.M. was placed in a class with an age-range of greater than three years, in violation of 8 NYCRR § 200.6(h)(5). (Pl. Ex. 47).

Also in March 2014, Payson filed complaints against Gaudette and Baron with the New York State Office of the Professions, claiming that they were misusing their positions and harming students. (Payson Dep. at 223-27).[16] Finally, in May 2014, Payson wrote a letter to the

---

[15] Payson's complaint also contained an allegation that the District changed the classroom ratios on students' IEPs without following the proper procedure, in violation of 8 NYCRR § 200.4(g)(1)—that allegation was sustained.

[16] Although Plaintiffs' Rule 56.1 Counterstatement cites to Exhibits 38 and 39, neither Exhibits 38 and 39, nor Exhibits 41, 51, 56 and 57, were provided to the Court.

BOE expressing her concerns about systemic changes that Gaudette had implemented, which in Payson's view, impacted the students negatively. (Gaudette Dep. at 191-93).

### ii. Union Activity

Payson claims that Defendants retaliated against her for her involvement in two instances of Union-related activity. First, in February 2014, Payson was involved in filing a snow day grievance, in which teachers sought pay for unused snow days. (Payson Dep. at 197-200; Pl. Ex. 63). Payson understood from her colleagues that Baron had threatened negative consequences if the grievance was not withdrawn. (Payson Dep. at 200-03). Payson was "very vocal not to withdraw it." (Payson Dep. at 209). In April 2014, morale among the staff in the District was reportedly low, and Payson was involved in the Union's decision to circulate a school climate survey. (Payson Dep. at 210-12). Payson met with staff members to work on developing the survey. (*Id.*). Thereafter, Gaudette circulated a memorandum to the District's staff noting his "disappointment" that the survey had been distributed. (Pl. Ex. 15).

### iii. Alleged Retaliation

Payson alleges that Gaudette and Baron began retaliating against her in February 2014. (Pl. Counterstatement ¶ 140). The alleged retaliation culminated in the elimination of her position in September 2014. (Def. Ex. M).

In February 2014, Gaudette required Payson to "perform a lot of data entry without training,"[17] on top of her other responsibilities and FLSA internship. (Payson Dep. at 240). Gaudette also assigned Payson additional work entering data related to testing around this time. (Gaudette Dep. at 108). Payson further claims that, around the same time, Baron had started preventing her from accessing information about students that she needed to perform her job.

---

[17] According to Defendants, Payson was responsible for the mistakes in the data entry, and was asked to correct those mistakes. (Gaudette Dep. at 102-07; Pl. Ex. 11).

(Payson Dep. at 152-57, 240-41; Pl. Ex. 11).  On March 17, 2014, Payson wrote to Gaudette regarding her "duties," noting that she was trying to "figure out how to prioritize the tasks," and that she would "appreciate [his] support." (Gaudette Dep. at 110-14; Pl. Ex. 29).  Gaudette and Baron both acknowledged that Payson had not asked to have her workload decreased. (Gaudette Dep. at 124, 132; Baron Dep. at 262).  Nevertheless, on March 25, 2014, Baron informed Payson that her responsibilities as testing coordinator would be transitioned to other staff. (Pl. Ex. 31). Gaudette explained to Payson that "this initiative" was "to address concerns about having too much on [Payson's] plate," while Payson replied that she was "up to date with all [her] responsibilities." (*Id.*).  In early April 2014, Baron advised Payson that she was removing much of Payson's guidance counselor responsibilities from her workload. (Payson Dep. at 245-47; Pl. Exs. 33, 34).

Around the time of March 2014, Gaudette decided that he could no longer support the building-level responsibilities that were associated with Payson's FLSA internship. (Gaudette Dep. at 128-40).  Gaudette communicated this decision to Baron and to the supervisor of Payson's internship at Bank Street, but did not immediately tell Payson. (*Id.*).  On March 27, 2014, in front of other staff, Baron told Payson that her building-level internship was "done." (Payson Dep. at 244-45; Pl. Ex. 81).  On April 29, 2014, Gaudette wrote an e-mail to Payson in which he told her that he could no longer support her internship. (Gaudette Dep. at 163; Pl. Ex. 37).

By letter dated May 23, 2014, Gaudette advised Payson that at the next BOE meeting, which was scheduled for May 28, 2014, he planned to recommend that Payson's position be reduced. (Gaudette Dep. at 194-96; Pl. Ex. 42).  Gaudette explained that this decision was based on "reasons of economy and efficiency." (Gaudette Dep. at 195; Pl. Ex. 42).  He testified that his decision was not primarily related to Payson's performance, and that she performed her

responsibilities "more than satisfactor[il]y." (Gaudette Dep. at 128-29, 195-97).  At the May 28, 2014 meeting, Gaudette presented a plan to reduce the District's deficit. (Pl. Ex. 43).  As part of the plan, he recommended the reduction of two District guidance counselor positions to one 0.15 FTE position. (*Id.* at PERB278).  Shortly thereafter, by letter dated May 29, 2014, Gaudette informed Payson that one guidance counselor position had been eliminated entirely, and that her position had been reduced to 0.15 FTE, which would involve working for several hours one day per week. (Def. Exs. K, L).  The reduction of Payson's position became effective on June 30, 2014. (Def. Ex. K).

Gaudette had discretion in determining what steps should be taken to "bring the budget into balance." (Callahan Dep.[18] at 13-14; Bolling Dep.[19] at 44-45).  Gaudette claims that his plan, which it appears was first advanced "out loud" in May 2014,[20] was for the responsibilities of the guidance counselors to be transferred to social workers and psychologists, to reduce the guidance department, and to move someone from guidance to the Director of PPS. (Gaudette Dep. at 168-85).

Finally, on September 19, 2014, Gaudette advised Plaintiff that he would recommend to the BOE that her 0.15 FTE position be eliminated, again citing reasons of economy and efficiency. (Def. Ex. M).  Gaudette testified that he had hired a Director of PPS, who was also a certified school counselor and who performed the 0.15 guidance counselor duties. (Gaudette Dep. at 222-23).  Payson was entitled to remain on the "Preferred Eligible" list for seven years,

---

[18] Refers to the deposition of Walter Callahan, the District's Chief Financial Officer ("CFO") until October 3, 2014. (Gould Aff. Ex. 85).

[19] Refers to the deposition of Suzanne Bolling, the Director of Special Education Fiscal Services for the New York State Department of Education. (Gould Aff. Ex. 87).

[20] Baron first learned of Gaudette's plan at the May 28, 2014 meeting. (Baron Dep. at 152-53).

starting from the reduction of her position, with a right to a full-time position in her tenure area, if one became available. (Def. Ex. M).

### iv. Procedural History

In July 2014, Payson filed an Improper Practice Charge with the New York State Public Employment Retaliations Board ("PERB"). (Def Exs. U, V; Pl. Ex. 95). In her PERB charge, Payson alleged that the District retaliated against her for her Union activity, in violation of the Public Employees' Fair Employment Act §§ 209-a.1(a) and (c). (Def. Ex. V at PERB50). Payson claimed that the termination of her internship, the decrease of her work load, and the reduction of her position to 0.15 FTE constituted retaliation.[21] (*Id.* at PERB73). Administrative Law Judge ("ALJ") Elena Cacavas held a hearing at which both Payson and the District presented evidence, and the ALJ issued her ruling on September 10, 2015. (*Id.* at PERB50-51, PERB80).

Under the Public Employees' Fair Employment Act, to prove retaliation, the charging party, Payson, had to show by a preponderance of the evidence that (i) she was engaged in activity that was protected under the Public Employees' Fair Employment Act; (ii) such activity was known to the person who effectuated the adverse action; and (iii) the complained-of action would not have been taken "but for" the protected activity. (*Id.* at PERB73). Once the charging party establishes a prima facie case, the burden shifts to the respondent, who may establish a legitimate, non-discriminatory reason for the complained-of action. (*Id.* at PERB74). The burden then shifts back to the charging party to prove that respondent's reason is pretextual. (*Id.*).

The ALJ first found that Payson had not met the second element, because she had not shown that Gaudette had knowledge of her Union-related activity. (*Id.* at PERB75). Next, the

---

[21] Payson's retaliation claim did not include the elimination of her position, which had not yet occurred in July 2014. (*See* Def. Ex. M).

ALJ found that even assuming, *arguendo*, that Payson had satisfied the second element, she had not met the third prong, which "look[ed] to the nexus between the protected activity and the adverse action[,]" and required that Payson "establish that 'but for' her protected activity," she would not have suffered the retaliation she alleged. (*Id.* at PERB75-76). The ALJ observed that "timing alone is not sufficient to satisfy the nexus requirement," and that Payson had relied "almost exclusively upon timing." (*Id.* at PERB76). Moreover, the ALJ determined that even if Payson had successfully established a prima facie case, Gaudette had "credibly proved that he acted for legitimate business reasons," and that Payson's "performance was at issue in the spring of 2014." (*Id.* at PERB78-79). The ALJ thus dismissed Payson's charge in its entirety. (*Id.* at PERB80).

On September 18, 2014, Payson filed a verified complaint with the New York State Division of Human Rights ("State Division of Human Rights"), in which she alleged that the District and Gaudette had discriminated against her based on her sex. (Def. Ex. W). The State Division of Human Rights found no probable cause to believe Payson's allegation, and dismissed her complaint on March 17, 2015. (*Id.*).

Payson also appealed to the NYSED, challenging the District's decision to eliminate the guidance counselor positions and her loss of employment. (Def. Ex. X). The Commissioner of Education dismissed her appeal on October 1, 2015, finding, *inter alia*, that Payson did not have standing to assert claims on behalf of students, and that she had not established a clear right to relief, because she had not shown that the District was failing to provide a guidance program. (*Id.*). However, the Commissioner referred the record to the Office of Special Education to ensure that the guidance program complied with federal and state law requirements for students with disabilities. (*Id.*).

### 3. Tyler

Tyler was hired as a special education teacher in 1993 and completed her probationary period in 1996. (Tyler Dep. at 11-13). During the relevant time, she taught at PCS. (*Id.*). From September 2012 to 2014, Tyler served as Vice President of the Union. (Tyler Dep. at 34, 43). As will be discussed *infra* Section I(A)(3)(iv), Tyler went on an administrative leave of absence in May 2014. (Def. Ex. JJ). She returned to work at the beginning of the 2015-2016 school year. (Pl. Counterstatement ¶ 306).

### i. Advocacy on Behalf of Students

In November 2011, several months after Gaudette became superintendent of the District, Tyler began advocating to Gaudette, on behalf of her students, that she believed they were receiving inadequate counseling services, in particular, from school psychologist Dr. Daria Kolesar. (Gaudette Dep. at 237; Pl. Ex. 50). She claimed that Dr. Kolesar was only seeing Tyler's students on a crisis basis, and that counselors were generally falling short on their duties, which left additional work for the teachers. (Gaudette Dep. at 237; Pl. Ex. 50). Tyler also advocated to Baron that Dr. Kolesar was not counseling students in accordance with their IEPs. (Baron Dep. at 82-83). Other teachers had made similar complaints to Baron; Baron investigated and monitored the issue, providing updates to Gaudette. (*Id.* at 84-87). Dr. Kolesar later resigned, but then returned to the District as a tenured school psychologist approximately one year later. (Gaudette Dep. at 233-36). After Dr. Kolesar returned, Gaudette advised her that she should not "get in [the] mix" with Tyler, and that she should instead "take the high road," while Gaudette "play[ed] in the dirt." (Pl. Ex. 71).

Also in or around November 2011, Tyler advocated to Gaudette on behalf of her student, "D.G.," expressing concern that a teaching assistant had not set appropriate boundaries with the student. (Gaudette Dep. at 241-43; Tyler Dep. at 134-38). Two months later, in January 2012,

Tyler advocated to Gaudette that another student, "K.C.," should not be moved out of Tyler's classroom. (Gaudette Dep. at 248-49; Tyler Dep. at 149-52; Def. Ex. Y). Gaudette had decided to move K.C. to a less restrictive environment, as recommended by Dr. Kolesar, while Tyler believed that K.C. would not succeed in such an environment. (Tyler Dep. at 152-53). In or around December 2012, Tyler advocated to Gaudette that she did not think her class was in compliance with the required ratio of students to teachers to aides. (Gaudette Dep. at 263-65; Tyler Dep. at 156-59). She claimed that failure to comply with the ratio violated a particular student's IEP. (Tyler Dep. at 156-59). Finally, approximately one year later, on February 4, 2014, Tyler advocated on behalf of her student, "J.A.," who was often truant and engaged in unsafe behaviors. (Tyler Dep. at 184-87). Tyler expressed her concerns to J.A.'s residential childcare counselor at JCAA, and discussed the topic of whether they should call the Justice Center, an organization that investigates neglect within institutions, including special education schools. (Gaudette Dep. at 280; Tyler Dep. at 185-87). Although Tyler described her conversation with J.A.'s residential childcare counselor, "Ms. Greene" ("Greene"), as "pleasant" and "professional," (Tyler Dep. at 187), the conversation later became the subject of conflict between Tyler, Gaudette, and others, as will be discussed *infra* Section I(A)(3)(iii).

### ii.  Union Activity

On December 6, 2013, in her role as Vice President of the Union, Tyler e-mailed the Union President questioning whether a request that teachers finish professional development work, as part of a workshop, outside of their contractual hours violated the Collective Bargaining Agreement. (Tyler Dep. at 170-73). Gaudette was copied on Tyler's e-mail. (*Id.* at 174). In February 2014, as Vice President of the Union and as a member of the Union grievance committee, Tyler filed the snow day grievance, discussed *supra* Section I(A)(2)(ii), by delivering it to the administrative assistant at PCS. (Tyler Dep. at 57-60; Pl. Ex. 63). Tyler also met with

Gaudette about the snow day grievance. (Tyler Dep. at 51). Gaudette discussed the grievance with the President of the Union, possibly with Tyler present, and advised that if the grievance was sustained it would have a "disastrous effect" on the District's budget, estimating that it would cost about $500,000. (Gaudette Dep. at 303-05). He further told Baron, and possibly Union representatives, that the only way to "get the money" on such "short notice" would be to "lay off all the teaching assistants." (*Id.* at 306-07). The Union was ultimately successful on the grievance and the teachers received back pay. (Tyler Dep. at 58-59).

On March 3, 2014, in her capacity as Union Vice President, Tyler sat with another employee, Suzanne Bruce ("Bruce"), while she completed a workers' compensation form. (Tyler Dep. at 67-70; Pl. Ex. 64). Bruce had requested that someone accompany her to complete the form, which is in Gaudette's office, because she was "afraid of him." (Pl. Ex. 64). Tyler noticed that the completed form contained the word "harassment." (Tyler Dep. at 70). The harassment claim was directed against Gaudette, and apparently stemmed from allegations Gaudette made regarding Bruce's billing practices. (Gaudette Dep. at 309-12; Tyler Dep. at 68). The following week, Tyler attended a meeting with Gaudette, Bruce and another Union representative. (Tyler Dep. at 71-72). Tyler claims that she attempted to ask questions on behalf of Bruce, but was told that she was not allowed to speak. (*Id.*). Finally, around the same time, in March or April of 2014, Tyler volunteered to start a committee to draft the school climate survey, discussed *supra* Section I(A)(2)(ii). (Tyler Dep. at 206-07).

### iii. Alleged Retaliation

Tyler alleges that she was retaliated against both for her Union-related activity and for her advocacy on behalf of students. First, she alleges that she was retaliated against in December 2013 for e-mailing the Union President concerning the request that teachers finish professional development work outside of their contractual hours. (Tyler Dep. at 174-77). Specifically, she

claims that Baron accused her of not attending the workshop in question, and advised her that a "letter" would be placed in her file. (*Id.*). At a meeting about her alleged absence—which Tyler denied, explaining that she had received permission to work from her classroom—Tyler claims that Gaudette angrily asked her questions about her e-mail to the Union President. (*Id.*). According to Gaudette, he assumed that she was absent based on her e-mail, and thought that she was "on the edge of insubordination." (Gaudette Dep. at 269-70). Gaudette proceeded to write a letter of counsel[22] to Tyler, claiming that she had not attended the required workshop and referencing the e-mail she had sent questioning the propriety of the assignment.[23] (Gaudette Dep. at 269-76). Gaudette testified that he had observed "a pattern of behavior of continued escalation and possible insubordination." (*Id.* at 275).

Tyler also claims that she was retaliated against in February 2014 for her advocacy on behalf of J.A. The day after Tyler spoke with Greene about J.A., and the possibility of calling the Justice Center, Tyler learned that Lori Mayes ("Mayes"), the director of PCS at JCAA, had heard about the conversation and had described it to Gaudette. (Gaudette Dep. at 283-85; Tyler Dep. at 187-89). On February 6, 2014, Gaudette met with Tyler regarding her conversation with Greene. (Tyler Dep. at 192-93). Gaudette told her that, according to what he had heard from Mayes, who was not present for Tyler's conversation with Greene but had heard about it from someone else (who also was not present for the conversation), Tyler had been adversarial and confrontational. (*Id.*; *see also* Pl. Ex. 60). From Tyler's perspective, her conversation with Greene had been pleasant. (Gaudette Dep. at 286; Tyler Dep. at 187). Nevertheless, on February 10, 2014, Gaudette wrote Tyler another letter of counsel, describing her conversation with

---

[22] Tyler described a "letter of counsel" as a "letter of advisement," advising an employee that she should "do something better." (Tyler Dep. at 250). She further stated that a letter of counsel is "not good." (*Id.*).

[23] Plaintiffs' Rule 56.1 Counterstatement cites to Exhibit 57 to establish the content of the letter. As described *supra* n.16, Exhibit 57 was not provided to the Court.

Greene as "accusing residential staff of being delinquent," and advising Tyler that her "actions and words result in the interpretation of you as unnecessarily and inappropriately accusatory, confrontational and antagonistic toward JCCA staff." (Pl. Ex. 62). The letter indicated that the Director of PCS had requested that Tyler not return to the residential area, and Tyler was directed to address any future concerns regarding students to a student's counselor, the dean of students or the principal. (*Id.*).

Next, Tyler alleges that she was retaliated against in March 2014, after she assisted Bruce with the workers' compensation claim. Two days after Tyler had accompanied Bruce to fill out the paperwork, she received a memorandum from Baron advising her of an investigation to determine whether there had been harassment, and "the extent of the alleged harassment;" Gaudette testified that Tyler was the subject of this investigation. (Gaudette Dep. at 320-21; Pl. Ex. 65). Tyler was also directed not to have any contact with members of the counseling team. (Pl. Ex. 65). In connection with the investigation, Gaudette asked Baron to gather statements from other staff who had made complaints about Tyler. (Gaudette Dep. at 324-26; Baron Dep. at 62-67; Pl. Ex. 67). On March 11, 2014, the same day that Tyler attended a meeting with Gaudette, Bruce and another Union representative, Gaudette decided to disband Tyler's class. (Gaudette Dep. at 328; Baron Dep. at 122-26; Tyler Dep. at 72-78). Baron was not aware that Tyler's class would be disbanded until that day, when Gaudette told her in passing that the class "has to be disbanded now." (Baron Dep. at 122-23). Gaudette told Tyler that his decision had to do with "group dynamics." (Tyler Dep. at 76).

For approximately two weeks after her class was disbanded, Tyler did not have an assignment. (Tyler Dep. at 84-86). She wrote to Baron at least twice, copying Gaudette the second time, and asked what her new assignment would be. (*Id.*). By letter dated March 27, 2014, Tyler was assigned to the Interim Alternative Education Setting ("IAES") program, which

is located in the Respite building on the PCS campus. (*Id.* at 86-88; Pl. Ex. 68). Tyler's new room in the Respite building had garbage on the floor and was not cleaned up by the time she was scheduled to start using it. (Tyler Dep. at 86-88). The IAES program is for students who had been suspended; the students were generally those who had acted out and their suspensions were often for "violent episodes." (*Id.*). Tyler was sometimes with the students by herself, and at times, students were threatening and made sexual comments to her. (*Id.*). Tyler was the only teacher assigned to the IAES program and was physically isolated in the Respite building; she had expressed concerns to Gaudette about her safety there. (Gaudette Dep. at 229-30). Gaudette testified that he did not think any teachers "want[ed] to do [the IAES program]." (*Id.* at 226-27).

Finally, as will be discussed *infra* Section I(A)(3)(iv), after Tyler's paid administrative leave ended, the District proposed that she return to work in the fall of 2014, pursuant to a Strategic Improvement Plan. (Tyler Dep. at 222-42). However, Tyler was not prepared to return at that time. (*Id.*; Pl. Ex. 96). Upon filing a grievance regarding sick time, Gaudette advised Tyler that, if she was not ready to return to work, she would have to take any additional time off as sick leave, or the issue would have to be addressed through a § 3020-a proceeding. (Pl. Ex. 96). *See also* N.Y. Educ. Law § 3020-a (McKinney). Tyler thus used approximately 130 sick days that she had accrued, and cites her loss of sick days as another form of retaliation. (Tyler Dep. at 264).

#### iv. Section 913 Evaluation

By letter dated May 6, 2014, Tyler was placed on administrative leave of absence with pay until the BOE meeting that was held on May 28, 2014. (Pl. Ex. 88). At the meeting, the BOE approved a resolution recommended by Gaudette that Tyler undergo a medical examination and evaluation of her fitness for duty, pursuant to New York Education Law Section 913

("Section 913"). N.Y. Educ. Law § 913 (McKinney).[24]   The examination was scheduled for July 11, 2014, with Dr. Andrew Levin, who specialized in adult and forensic psychiatry. (Def. Exs. KK, LL).   In a report dated July 21, 2014, Dr. Levin diagnosed Tyler with unspecified personality disorder, and provided his opinion that, at the time of his evaluation, she was "unfit to resume her teaching duties." (Def. Ex. LL).   Dr. Levin also recommended a course of action that would prepare Tyler to return to work. (*Id.*).   In light of Dr. Levin's evaluation, Tyler was asked to return to work in September 2014 pursuant to a Strategic Improvement Plan. (Def. Ex. MM).   In response, Tyler submitted three medical evaluations, two of which evaluated her as fit for duty. (Pl. Ex. 90).   Tyler's treating psychologist, however, wrote that "it would be a disservice to [Tyler] to ask her to return to such a negative environment until there is some resolution of the conflicts in question." (*Id.*).   Tyler decided not to return to work in September 2014. (Tyler Dep. at 238-42).   In April 2015, however, she advised Gaudette that she was ready to return. (*Id.* at 242-43).   The paid medical leave extended through the date of Dr. Levin's report in July 2014, and, as discussed *supra* Section I(A)(3)(iii), Tyler used sick leave for the remainder of the time that she was not working. (Pl. Ex. 96).   Tyler was evaluated by Dr. Levin a second time in July 2015 and was deemed fit for duty, and returned to her position at the IAES program at the beginning of the 2015-2016 school year. (Tyler Dep. at 242-45).

**v. Procedural History**

Tyler filed PERB and EEOC complaints. (Tyler Dep. at 259-61).   The complaints were settled and withdrawn, respectively. (*Id.*).

---

[24] Although the parties dispute whether the BOE had authority to order a Section 913 examination, the Court will not consider this issue at this time.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000). That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the moving party meets this initial burden, the burden then shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party 'is required to go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (quoting *Celotex*, 477 U.S. at 324), and "must do more

than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

In the Southern District of New York, parties moving for and opposing summary judgment must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, "uncontested fact[s] cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"—in the absence of citations or "where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted). The Court therefore has discretion "to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3). Nevertheless, the Court is "not required to consider what the parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).

## III. DISCUSSION

Defendants argue that they are entitled to summary judgment because (i) Payson's claims are barred by collateral estoppel; (ii) Plaintiffs cannot establish prima facie cases of retaliation under the First Amendment or the Rehabilitation Act; (iii) Payson cannot establish a prima facie

claim under Section 75-b; and (iv) the individual Defendants are entitled to qualified immunity. (Def. Br.; Def. Reply).  Plaintiffs oppose the Motion. (Pl. Br.).

## A. Preclusive Effect of Payson's PERB Charge

As an initial matter, Defendants argue that Payson's claims for retaliation are barred in their entirety by the ALJ's decision in Payson's PERB charge under the doctrine of collateral estoppel. (Def. Br. at 24-25; *see also* Def. Ex. V).  Payson opposes this argument and asserts the following: (i) that there is no identity of issues between what was decided at the PERB proceeding and the issues in this action; (ii) that PERB did not have jurisdiction to determine Payson's First Amendment, Rehabilitation Act, or New York Civil Service Law claims; (iii) that the standard used by the ALJ to determine a causal connection between the protected activity and the alleged retaliation is different than the standard applied under federal law;[25] and (iv) that courts in the Second Circuit decline to extend preclusive effect to agency determinations of law, as opposed to factual determinations. (Pl. Br. at 28).  Payson also notes that her PERB charge did not include the elimination of her position. (*Id.* at 27; *see also* Def. Ex. V; Pl. Ex. 95).

The Supreme Court found in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), that in claims brought under Section 1983, "the factual determinations of a state administrative agency, acting in a judicial capacity, are entitled to the same issue and claim preclusive effect in federal court that the agency's determinations would receive in the State's courts." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 728 (2d Cir. 2001) (citing *Elliott*, 478 U.S. at 798-99).  In New York, "courts give quasi-judicial administrative fact-finding preclusive

---

[25] Specifically, the ALJ used a "but for" standard in her causal analysis, while under federal law, the standard is whether the protected activity was a "substantial motivating factor" in the alleged adverse employment action. *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 31 (2d Cir. 2016).

effect where there has been a full and fair opportunity to litigate." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005) (citing *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 499-500 (1984)). "It is well established that 'PERB acts in a quasi-judicial capacity,' given its power to conduct hearings in which it administers oaths, examines witnesses and documents, takes testimony, receives evidence and issues subpoenas." *Gemerek v. Buffalo Sewer Auth.*, No. 99-CV-0879S, 2011 WL 3047737, at *6 (W.D.N.Y. July 25, 2011). Courts in the Second Circuit have held that facts determined in PERB proceedings have preclusive effect on subsequent federal litigation, even when subsequent federal litigation presents constitutional challenges. *See Perry v. Metro. Suburban Bus Auth.*, 390 F. Supp. 2d 251, 266 (E.D.N.Y. 2005); *O'Connor v. Mazzullo*, 536 F. Supp. 641, 643-44 (S.D.N.Y. 1982).

To invoke collateral estoppel in New York, "there must be an 'identity of issue which has necessarily been decided in the prior action and is decisive of the present action,' and the party to be estopped must have had a 'full and fair opportunity to contest the decision now said to be controlling.'"[26] *Kosakow*, 274 F.3d at 730 (quoting *Schwartz v. Public Adm'r*, 24 N.Y.2d 65, 71 (1969)). Turning first to the identity of issues, the essence of Payson's PERB charge was that she was retaliated against for her Union activity. (Def. Ex. V; Pl. Ex. 95). Specifically, the ALJ considered Payson's Union involvement, including her participation in the snow day grievance

---

[26] Furthermore, "[t]he burden of proving identity of the issue rests on the proponent of collateral estoppel, while the opponent bears the burden of proving that he or she did not have a full and fair opportunity to litigate the issue." *Kosakow*, 274 F.3d at 730. Payson argues that Defendants have not met their burden to show an identity of issues. (Pl. Br. at 28). The Court agrees that Defendants have not met their burden. The only statement Defendants offer in support of the identity of issues is a claim, which Payson denies, that Payson "admits all of the claims asserted in her [PERB proceeding] are raised in this action." (Def. Br. at 25). However, the Court also finds that Payson did not meet her burden to show that she did not have a full and fair opportunity to litigate the issues raised in her PERB charge. Instead, Payson argues only that PERB did not have jurisdiction to determine Payson's First Amendment, Rehabilitation Act and New York Civil Service Law claims. (Pl. Br. at 28). Although both parties have failed to meet their burdens, the Court nevertheless finds it necessary to assess the applicability of collateral estoppel.

and the school climate survey, and her allegations of retaliation, including the stripping of her internship-related responsibilities and the reduction of her position to 0.15 FTE. Those instances of protected activity and alleged retaliation comprise the same factual basis of Payson's pending First Amendment claim for Union-related activity. Moreover, the ALJ decided several issues which were both necessary to the PERB decision and are decisive of Payson's current First Amendment Union-related claim.[27] Specifically, the ALJ found that (i) Gaudette had no knowledge of Payson's Union activity; (ii) Payson could not establish that her Union activity was a "but for" cause of the alleged adverse employment actions; and (iii) the District had legitimate business reasons for the alleged adverse employment actions. (Def. Ex. V). Because these factual findings would decide the element of causation under Payson's First Amendment retaliation claim, this constitutes an identity of issue. *See Kosakow*, 274 F.3d at 733; *see also Gordon v. Marquis*, No. 3:03CV01244 AWT, 2007 WL 987553, at *10 (D. Conn. Mar. 31, 2007) (finding that, in a First Amendment retaliation claim, a "causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity.").

The Court must next determine whether the parties in Payson's PERB charge had a full and fair opportunity to litigate. The PERB hearing took place over four days. (Def. Ex. V). At the hearing, the parties were represented by counsel, submitted exhibits, examined multiple witnesses and submitted post-hearing briefs. (*Id.*). The ALJ's decision was thirty-one pages long and analyzed the evidence and issues in detail. (*Id.*). The Court therefore finds that the parties had a full and fair opportunity to litigate the PERB charge. *See, e.g., Gemerek*, 2011 WL

---

[27] As will be discussed in greater detail *infra* Section III(B), to establish a claim for retaliation in violation of the First Amendment for her Union activities, Payson would need to show that her conduct was protected by the First Amendment, that she suffered an adverse employment action, and that a causal connection between the protected activity and the adverse action existed.

3047737, at *10 (finding parties had full and fair opportunity to litigate PERB claim where, *inter alia*, hearing was held over six days, both parties were represented, and counsel presented and cross-examined witnesses and introduced evidence).

Having found an identity of issue and determined that the parties had a full and fair opportunity to litigate Payson's PERB charge, the Court finds that the ALJ's findings of fact have preclusive effect on the instant litigation. Specifically, the Court finds that the following factual determinations are precluded from further litigation: (i) that Gaudette had no knowledge of Payson's Union activity through the time that her position was reduced to 0.15 FTE; (ii) that there was no causal nexus between Payson's Union activity and the alleged adverse employment actions;[28] and (iii) that the District had legitimate business reasons for taking away Payson's internship-related responsibilities and reducing her position. *See Kosakow*, 274 F.3d at 733 (determination that employee was terminated for a legitimate business reason was a finding of fact); *Montalvo v. U.S. Postal Serv.*, No. 95-6251, 1996 WL 935448, at *1 (2d Cir. Apr. 19, 1996) (in the employment discrimination context, "[q]uestions of . . . causation are issues of fact."). However, the ALJ did not review Payson's termination, because her position had not yet been eliminated at the time of the PERB proceeding. Therefore, Payson's claim of retaliation for Union activity with respect to her termination is not barred.[29] *Olson v. State of New York*, No. 04CV0419 (DRH) (MLO), 2005 WL 5885368, at *3 (E.D.N.Y. Mar. 9, 2005) (finding no

---

[28] Even if the Court did not give preclusive effect to the ALJ's finding regarding causation, as Payson suggests, her claims would nevertheless be precluded because Gaudette did not know about Payson's Union activity, and without knowledge, Payson cannot show causation. *Gordon*, 2007 WL 987553, at *10. Moreover, the ALJ found that even if causation had been established, there were legitimate business reasons for the alleged adverse employment actions.

[29] Although the ALJ found that Gaudette had no knowledge of Payson's Union activity at the time her position was reduced, interpreting the facts in the light most favorable to Plaintiff, the Court leaves open the possibility that Gaudette learned of Payson's Union activity prior to eliminating her position. Indeed, Gaudette would have learned of Payson's Union activity when the PERB charge was filed in July 2014, and her position was eliminated in September 2014. (Def. Exs. M, V).

preclusive effect where claims regarding plaintiff's termination had not been litigated or decided).

The Court has also considered whether the ALJ's finding that the District had legitimate business reasons for eliminating Payson's internship-related responsibilities and reducing her position should have preclusive effect on Payson's First Amendment claims for retaliation based on her advocacy on behalf of students. However, the facts underlying those claims were not raised in the PERB proceeding or considered by the ALJ. The Court therefore finds no identity of issue between the student advocacy-related retaliation claims and the Union-related retaliation claims that were decided by the ALJ. *See Gemerek*, 2011 WL 3047737, at *7-8 (finding no identity of issue where the ALJ, in finding legitimate business reason for employee's termination, did not consider whether other conduct motivated adverse employment action); *see also Vargas v. City of New York*, 377 F.3d 200, 206 (2d Cir. 2004) (although the "Article 78 court passed upon the propriety of [the employee's] termination, this acknowledgment does not demonstrate that the court 'actually and necessarily' decided an issue that was never presented to it, even if that issue touched, in a general sense, on the propriety of the termination."). The Court therefore limits the preclusive effect of the ALJ's finding regarding legitimate business reasons for the alleged adverse employment actions to Payson's Union-related claims, prior to her termination.

## B. First Amendment Retaliation Claims Pursuant to Section 1983

Plaintiffs bring their First Amendment retaliation claims pursuant to Section 1983. "'A [S]ection 1983 claim lies where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.'" *Gemerek*, 2011 WL 3047737, at *11 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2nd Cir. 2000)). To prove a claim under Section 1983, a plaintiff must show that "(1) the challenged conduct was

attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 290 (E.D.N.Y. 2009) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)). The parties do not dispute that Defendants were acting under state law. The remaining question, therefore, is whether Defendants' conduct deprived Plaintiffs of their rights under the First Amendment. "It is well established that the First Amendment prohibits government entities from punishing its employees in retaliation for the content of their public speech." *Gemerek*, 2011 WL 3047737, at *11 (collecting cases).

To establish a prima facie claim for First Amendment retaliation, a plaintiff must show that (i) her speech or conduct was protected by the First Amendment; (ii) she suffered an adverse employment action; and (iii) there was a causal connection between the adverse employment action and the protected speech—specifically, that the protected activity was "at least a substantial or motivating factor" in the adverse employment action. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013); *see also, e.g., Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

If a plaintiff establishes a prima facie case, "[a] defendant may nonetheless escape liability if it can demonstrate that (1) 'it would have taken the same adverse action in the absence of the protected speech,' or (2) 'show that plaintiff's speech was likely to disrupt [defendant's] activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech.'" *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 31 (2d Cir. 2016) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 382-83 (2d Cir. 2003)); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) ("Even if the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense. One such defense, articulated in *Mt. Healthy* . . .

27

provides that 'even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech.'") (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

First, for speech or conduct to be protected by the First Amendment, the plaintiff must have spoken or acted as a private citizen, rather than as a public employee, on a matter of public concern. *Matthews*, 779 F.3d at 172 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Pickering v. Bd. Of Educ. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). Matters of public concern "relat[e] to any matter of political, social, or other concern to the community[.]" *Connick v. Myers*, 461 U.S. 138, 146 (1983). If the plaintiff spoke as a public employee, or if the subject of the plaintiff's speech was not a matter of public concern, "that is the end of the matter." *Matthews*, 779 F.3d at 172; *see also Agyeman v. Roosevelt Union Free Sch. Dist.*, No. 15CV987JFBARL, 2017 WL 2418304, at *7 (E.D.N.Y. June 5, 2017) ("If plaintiff fails to satisfy either requirement, then plaintiff's First Amendment retaliation claim must fail as a matter of law.").

If the plaintiff spoke as a private citizen on a matter of public concern, the next question is whether she suffered an adverse employment action. "In the context of a First Amendment retaliation claim, [the Second Circuit has] held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). Such adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* at 226. These examples, however are "certainly not exhaustive," and whether a plaintiff suffered an adverse employment action is a "heavily fact-specific, contextual determination." *Id.*

Finally, to establish causation on a First Amendment retaliation claim, a plaintiff "must show a connection 'sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Zehner*, 666 F. App'x at 31 (quoting *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006). A party can show causation "indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Id.* When a party relies on "'the mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action,' . . . courts 'uniformly hold that the temporal proximity must be very close.'" *Adams v. Ellis*, No. 09 CIV. 1329 PKC, 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)), *aff'd*, 536 F. App'x 144 (2d Cir. 2013).

## 1. Right to Speak Out on Matters of Public Concern

Plaintiffs claim that they were retaliated against in violation of their First Amendment rights to speak out on matters of public concern. These claims relate to Plaintiffs' advocacy on behalf of students.

### i. Standard

To determine whether Plaintiffs' speech was protected, the Court must first analyze whether Plaintiffs spoke as private citizens on matters of public concern. In analyzing whether a plaintiff spoke as a private citizen, a court must ask (i) whether the speech fell outside of the employee's official responsibilities; and (ii) whether a "civilian analogue exist[ed]" for the plaintiff's speech. *Matthews*, 779 F.3d at 173 (citing *Weintraub v. Bd. of Educ. of City Sch. Distr. of City of N.Y.*, 593 F.3d 196, 203-04 (2d Cir. 2010)). Turning first to an employee's official duties, courts look to whether the speech was "'part of what [the speaker] . . . was employed to do.'" *Id.* (quoting *Garcetti*, 547 U.S. at 421) (alteration in original). "In *Garcetti*, the Supreme

Court adopted a functional approach toward evaluating an employee's job duties. . . . [and] counseled that the appropriate inquiry is a 'practical one' directed to the regular duties of the employee." *Id.* (quoting *Garcetti*, 547 U.S. at 424). Formal job descriptions, while relevant, are "'neither necessary nor sufficient'" to assess the "'scope of the employee's professional duties for First Amendment purposes.'" *Id.* (quoting *Garcetti*, 547 U.S. at 424-25). The Second Circuit has noted that "'whether a public employee is speaking pursuant to her official duties is not susceptible to a bright line rule,' and that '[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.'" *Id.* (quoting *Ross v. Breslin*, 693 F. 3d 300, 306 (2d Cir. 2012)). In sum, "courts in the Second Circuit 'focus[] on the subject, manner, and context of the speech to determine whether it relates to topics that are indispensable prerequisites to effective performance of the speaker's primary employment responsibility, and thus not entitled to First Amendment protection.'" *Montero v. City of Yonkers, New York*, 224 F. Supp. 3d 257, 265-66 (S.D.N.Y. 2016) (quoting *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208-09 (E.D.N.Y. 2013)), *appeal docketed*, No. 17-76 (2d Cir. Jan. 6, 2017).

### ii. Payson

Payson testified that her role as District guidance counselor included overseeing the "entire" District guidance program, making sure that students were in the correct classes, that their grade levels were accurate, and "those types of duties." (Payson Dep. at 17, 20). In essence, Payson's advocacy for students consisted of the following: (i) advocating that certain students would be best served by remaining in self-contained classes; (ii) advocating for students whom she believed had been placed at the wrong grade level; (iii) advocating for students whom she believed had been placed at the wrong school; and (iv) advocating that counselors should be

assigned to one specific class, so that group counseling would be possible, rather than assigned to individual students "randomly." (*See supra* Section I(A)(2)(i); Payson Dep. at 170-80).

### iii. Tyler

Tyler was a special education teacher, who advocated on behalf of her special education students. In describing her duties as a special education teacher, she testified that she "ran the program" in her classroom and that she performed "basic teacher duties," specifically, she developed lesson plans, instructed the students, kept records, tracked the students' progress and administered tests. (Tyler Dep. at 21-22). Two other employees helped Tyler in the classroom: a teaching assistant and a behavioral aid. (*Id.*). She worked together with these two colleagues "doing behavioral tracking so we could facilitate improvement of some of the behavior issues that were in the classroom." (*Id.*). In the context of a particular student for whom she advocated, J.A., she noted that the residential staff "serve[d] in a parental capacity," and therefore "as much [as] a teacher would go to a parent, I went to [the residential staff] to try to facilitate some kind of intervention for [J.A.] to help her be more successful." (Tyler Dep. at 185). Tyler's advocacy consisted of the following: (i) that one of her students had an inappropriate relationship with a former teaching assistant; (ii) that another of her students should not be moved out of her classroom; (iii) that a third student, J.A., who was often truant and engaged in unsafe behaviors, needed help; (iv) that her students were not receiving counseling in accordance with their IEPs; and (v) that her class was not in compliance with the required ratio of students to teachers to aides. (*See supra* Section I(A)(3)(i); Tyler Dep. at 134-38, 149-59, 184-87).

### iv. Application

Turning first to Payson, the first three examples of her advocacy—advocating that certain students should remain in self-contained classes, and that certain students had either been placed at the wrong grade level or school—correspond directly to her own description of her duties as

District guidance counselor, specifically, ensuring that students were properly placed in the appropriate classes and grades. (Payson Dep. at 20). Her fourth example of advocacy, speaking out about the "random[]" assignment of counselors to students, and advocating that counselors should instead be assigned to a specific class, is also generally related to her responsibilities as a guidance counselor. Payson's description of her work was non-exhaustive, as she included the category, "those types of duties," and the manner in which students received counseling, specifically, whether group counseling was available to students in particular classes, is correlated to overseeing students' placement in classes. Moreover, "courts have routinely and correctly held" that "complaining about . . . the lack of resources and support . . . involves a public school teacher's professional duties." *Agyeman*, 2017 WL 2418304, at \*9 (collecting cases); *see also Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 207 (E.D.N.Y. 2009) ("Plaintiff's complaints concerning . . . the appropriateness of the counseling curriculum are matters relating to [the plaintiff's] own job responsibilities as an educator and school psychologist, and therefore is unprotected speech.").

In terms of Tyler's advocacy, as an initial matter, it is relevant that she advocated exclusively on behalf of her own students, and that she advocated within the District—either to Baron or Gaudette, or to one student's residential staff, who served in a parental role. Moreover, the first three examples of her advocacy—the relationship of one of her students with a former teaching assistant, that another student should not be moved from her class, and that a third student needed behavioral help—fall squarely within the category, as described by Tyler, of tracking her students' progress and their behavioral issues. *See Woodlock v. Orange Ulster B.O.C.E.S.*, 281 F. App'x 66, 68 ("[P]laintiff's communications . . . were made pursuant to her 'official duties' as a special education counselor, in which capacity she was responsible for monitoring her students' behavior, needs and progress."); *Stahura-Uhl v. Iroquois Cent. Sch.*

32

*Dist.*, 836 F. Supp. 2d 132, 142 (W.D.N.Y. 2011) ("It takes no standardized employee handbook or directive from the [s]chool [d]istrict . . . to conclude that in addition to instructing her students, a teacher should also advocate on their behalf.  This includes communicating with other teachers when concerned about a student's progress; and it must also include communicating with the student's parents when the teacher believes the [d]istrict is not properly providing for its students.").  Tyler's final two examples of advocacy are also clearly within the bounds of her job as a special education teacher: monitoring compliance with her students' IEPs, as well as complying with the required ratio of students to teachers to aides, relate to ensuring that her classroom was functioning properly, and could be described either as "basic teacher duties" or as part of her responsibility to "r[u]n the program." (Tyler Dep. at 21-22). *See Agyeman*, 2017 WL 2418304, at *9 ("the case law demonstrate[s] that plaintiff indisputably spoke as a public employee . . . alleging violations of law and [d]istrict policies and procedures."); *Harris v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 230 F. Supp. 3d 88, 102 (E.D.N.Y. 2017) (citing *Weintraub*, 593 F.3d at 203) ("Reporting a violation of state law to ensure the welfare of students is a duty of a teacher, and 'in furtherance of the execution of one of her core duties.'").

Plaintiffs' advocacy was thus necessary to the "effective performance of [their] primary employment responsibilit[ies]." *Montero*, 224 F. Supp. 3d at 265-66.  Because Plaintiffs' speech was "part-and-parcel of [their] concerns about [their] abilit[ies] to properly execute [their] duties," the Court finds that both Plaintiffs spoke as public employees.[30] *Weintraub*, 593 F.3d at 203 (citation and quotation marks omitted); *see also Ross v. Breslin*, 693 F.3d 300, 306 (2012).

---

[30] The Court has also analyzed whether civilian analogues existed for Plaintiffs' speech.  Although Payson filed complaints with the NYSED and wrote letters to the New York State Office of the Professions (within the NYSED) and to the BOE, such conduct does not, in and of itself, indicate that she spoke as a private citizen. *Agyeman*, 2017 WL 2418304, at *11 (collecting cases).  Turning to Tyler, she advocated only to her supervisors or other staff, which weighs against finding any civilian analogue. *Id.* at *10 (collecting cases); *see also Stahura-Uhl*, 836 F. Supp. 2d at 140 ("[I]t is clear that complaints that do follow the 'established institutional channels' are not protected.").

"'[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.'" *Matthews*, 779 F.3d at 173 (quoting *Garcetti*, 547 U.S. at 421). Having found that Plaintiffs did not speak as private citizens, "that is the end of the matter," *id.* at 172, and the Court need not analyze whether they spoke on matters of public concern, *see Montero*, 224 F. Supp. 3d at 265. The Court therefore finds that Plaintiffs' student advocacy was not protected, and their claims for retaliation in violation of their First Amendment rights to speak out on matters of public concern fail as a matter of law.[31]

## 2. Advocacy on Behalf of Union and its Members and Right to Association with Union

### i. Standard

To determine whether speech on behalf of the Union and its members was protected by the First Amendment, the Court applies the same test as set forth in Section III(B)(1)(i) *supra* to assess whether Plaintiffs spoke as private citizens on matters of public concern. *See Lynch v. Ackley*, 811 F.3d 569, 577-78 (2d Cir. 2016). Turning to the first prong, whether a public employee spoke pursuant to her official duties or as a private citizen when speaking on behalf of a union, the Second Circuit has observed that:

> It is not clear that speech by employees in the role of union officers, involving advocacy as to the *terms and conditions of employment*, fits comfortably into either category. While such speech is not made pursuant to duties *imposed by the employer*, such speech *is* made pursuant to duties that arise from the employment relationship between management and the union membership—the duty of union officers is to represent the membership in advocacy and negotiation as to the terms and conditions of employment.

*Id.* at 582 n.13 (emphasis in original). That said, the Supreme Court has clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope

---

[31] The Court notes that "the fact that [p]laintiff[s] make[] no attempt in [their] briefing to explain why [their] speech was made as . . . private citizen[s]—[they] do[] not even cite to *Matthews*—is itself telling[.]" *Montero*, 224 F. Supp. 3d at 272.

of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. 2369 at

2379. Depending on the context of the union-related speech, courts have ruled both ways on

whether it is speech of a public employee or a private citizen. *Compare Montero*, 224 F. Supp.

3d at 269 (plaintiff's speech against management, as union vice president at union meetings, was

not as a citizen and not protected), *with Pekowsky v. Yonkers Bd. of Educ.*, 23 F. Supp. 3d 269,

277 (S.D.N.Y. 2014) (union representative's speech to supervisors was as a citizen and was

protected).

   If the court finds that a plaintiff spoke as a private citizen, the next inquiry is whether the

speech touches on a matter of public concern. "Whether an employee's speech addresses a

matter of public concern is a question of law for the court to decide, taking into account the

content, form, and context of a given statement as revealed by the whole record." *Lewis v.*

*Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (citing *Connick*, 461 U.S. at 147-48 and n.7). "Speech

involves matters of public concern 'when it can be fairly considered as relating to any matter of

political, social, or other concern to the community, or when it is a subject of legitimate news

interest; that is, a subject of general interest of value and concern to the public.'" *Lane*, 134 S.

Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (quotation marks omitted). In

contrast, "speech on a purely private matter, such as an employee's dissatisfaction with the

conditions of his employment, does not pertain to a matter of public concern." *Lewis*, 165 F.3d at

163. An "internal grievance procedure in many cases will not seek to communicate to the public

or to advance a political or social point of view beyond the employment context," and thus may

not be a matter of public concern. *Borough of Duryea v. Guarnieri*, 546 U.S. 379, 398 (2011).

   Some district courts in the Second Circuit have found that union membership is per se a

matter of public concern. *See, e.g., Buckley v. New York*, 959 F. Supp. 282, 298 (E.D.N.Y.

2013); *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 509-10 (E.D.N.Y. 2011);

*Donovan v. Inc. Vill. of Malverne*, 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008). Courts have applied language from *Clue v. Johnson*—specifically, that "retaliation against public employees solely for their union activities violates the First Amendment" and "raises a public concern"—to make that determination. 179 F.3d 57, 60 (2d Cir. 1999). However, the Second Circuit has recently clarified that not all union-related activity raises a matter of public concern. In *Lynch*, the District Court, citing *Pekowsky*, found that the plaintiff spoke as a citizen on a matter of public concern when he filed a grievance, "on behalf of himself and other union members," regarding the presence of his supervisor at a union meeting. *Lynch v. Ackley* ("*Lynch Dist. Ct.*"), No. 3:12-CV-537 MPS, 2014 WL 4782812, at *4 (D. Conn. Sept. 24, 2014), *rev'd and remanded*, 811 F.3d 569 (2d Cir. 2016). On appeal, the Second Circuit opined that it was "unclear whether such a grievance should be viewed as a matter of public concern." *Lynch*, 811 F.3d at 582. The Second Circuit cautioned that "[t]hough the court said in dicta [in *Clue*] that 'retaliation solely for union activity clearly raises a public concern,' it obviously did not mean that all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union." *Id.* (citation omitted). The court further explained that:

> [l]abor versus management disputes, needless to say, almost invariably involve a conflict between the labor force and management over an issue that concerns the terms and conditions of employment. Such disputes often have a strong flavor of 'personal grievance' notwithstanding that the personal grievance is shared by numerous employees.

*Id.* at 581; *see also Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 250 (6th Cir. 2007) (finding plaintiff's participation in other police officers' union grievances was not a matter of public concern, and noting that "[a] group effort to gain more overtime is no less an internal personnel dispute than if it were the effort of one officer."). The Second Circuit provided examples of labor versus management disputes that would, in contrast, touch on matters of

public concern: "the delivery of services to the public," or disputes that "invoke[] basic aspects of the right to unionization." *Lynch*, 811 F.3d at 581.

Similarly, a First Amendment freedom of association claim also requires that "a public employee . . . persuade a court that the associational conduct at issue touches on a matter of public concern." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004). The Second Circuit has observed, however, that "it is unclear whether, and if so, how, *Garcetti* applies to claims of retaliation against protected association." *Lynch*, 811 F.3d at 583 n.14.

**ii. Payson**

As discussed *supra* in Section III(A), Payson's claims for retaliation related to Union activity are barred except for her claim regarding the elimination of her position. Payson claims that she was retaliated against for the following Union-related conduct: (i) she was involved in filing the snow day grievance, and was "very vocal not to withdraw it;" and (ii) she participated in the Union's decision to circulate a survey regarding the teachers' morale, and worked with other staff members to develop the survey. (Payson Dep. at 208-12).

**iii. Tyler**

Tyler served as the Vice President of the Union. In her role as a Union representative, Tyler covered PCS, and was "the person the PCS people seemed to use or go to or ask questions of in the building[.]" (Tyler Dep. at 34-35). She "helped facilitate meetings, . . . attended executive committee meetings," and "worked on committees, grievances." (*Id.*). She claims that she was retaliated against for engaging in the following conduct in her role as a Union representative: (i) she wrote to the Union President and questioned the propriety of asking teachers to participate in a professional development workshop outside of their contractual hours; (ii) she filed the snow day grievance and met with Gaudette about it; (iii) she volunteered to start a committee to draft the survey of teachers' morale; and (iv) she accompanied another employee,

Bruce, to complete a workers' compensation claim and went with Bruce to a subsequent meeting with Gaudette about the claim.

**iv. Application**

The Court must first decide whether Payson and Tyler spoke as private citizens or as public employees, which is an especially difficult determination to make for union representatives such as Tyler. *Lynch*, 811 F.3d at 582 n.13.  Looking to the Supreme Court's guidance in *Lane*, "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S. Ct. 2369 at 2379.  Turning first to Payson, her two instances of Union activity related to the snow day grievance and the staff morale survey.  The snow day grievance sought pay for unused snow days, (Pl. Ex. 63), which relates wholly to issues of compensation and hours worked.  The survey regarding the staff's morale, which Payson was involved in drafting, took shape because "the morale was very low in the building." (Payson Dep. at 210).  The survey sought to collect input from the staff "and then present it to administration for the hopes of improvement." (*Id.*). An employee's hours and compensation, as well as an employee's relationship with management, are all within the ordinary bounds of her employment and are "topics that are indispensable prerequisites to effective performance of [plaintiff's] primary employment responsibility[.]" *Montero*, 224 F. Supp. 3d at 265-66 (quoting *Dillon*, 917 F. Supp. 2d at 208-09); *see also Adams v. New York State Educ. Dep't*, No. 08 CIV 5996 VM AJP, 2010 WL 624020, at *26 (S.D.N.Y. Feb. 23, 2010) ("[Plaintiff's] filing of a grievance about her work assignment did not amount to speech as [a] citizen for First Amendment purposes.") (internal quotation marks omitted), *report and recommendation adopted in relevant part,* 705 F. Supp. 2d 298 (S.D.N.Y. 2010).  The Court therefore finds that the subject of Payson's union activities was within the scope of her employment duties.  Moreover, there were no civilian analogues for

Payson's activity. *See Weintraub*, 593 F.3d at 204 (filing union grievance had no civilian analogue); *Montero*, 224 F. Supp. 3d at 268-69 ("Plaintiff . . . expressed [his] displeasure with management through [his] union in a forum not available for use by ordinary citizens."). As such, Payson acted as a public employee.

Similarly, although Tyler was a representative of the Union, her activity regarding the snow day grievance, the morale survey and the number of hours worked in relation to the professional development workshop were within the scope of her employment duties. As explained above, these issues were within the purview of an employee's responsibilities because hours, compensation and the dynamic between employees and their supervisors are necessary to effectively perform one's job. Moreover, as with Payson's Union activity, Tyler's activity had no civilian analogues. Therefore, Tyler's conduct was as a public employee with regard to the above-listed activities. However, her Union representation of a fellow employee during the filing of, and subsequent meeting regarding, that employee's workers' compensation claim was not within the scope of Tyler's own employment duties and did not concern Tyler or her employment in any way. Therefore, that conduct was as a private citizen.[32]

Even if the Court assumes, *arguendo*, that Plaintiffs spoke and acted as private citizens when participating in Union-related activities, with the exception of Tyler's representation of another employee, such conduct did not touch on matters of public concern. The Court looks to the Second Circuit's recent decision in *Lynch*, which provides guidance on the question of whether union activity is a matter of public concern.[33] 811 F.3d at 581-82. Applying *Lynch*,

---

[32] Although there may be no civilian analogue for this conduct, the Court does not find that dispositive. *See Montero*, 224 F. Supp. 3d at 270 (noting that although "courts in the Second Circuit are split . . . [n]othing in *Matthews* suggests that the Second Circuit intended to abrogate the unremarkable comment in *Weintraub* that neither factor is dispositive[.]"); *see also Pekowsky*, 23 F. Supp. 3d at 277 (finding that union representative spoke as private citizen without analyzing the existence of a civilian analogue for plaintiff's speech).

[33] Although the Court notes that this language in *Lynch* is dicta, it nevertheless provides a roadmap for this issue.

union conflict about the terms and conditions of employment, even as related to a number of

employees, is not a matter of public concern, if the essence of the conflict has a "strong flavor of

personal grievance." *Id.* (quotation marks omitted).  This seems to the Court a logical extension

of cases such as *Weintraub*, which indicate that a teacher's personal grievance filed with a union

is not per se protected speech, merely because it was filed with the union. *Weintraub*, 593 F.3d at

203; *see also, e.g.*, *Montero*, 224 F. Supp. 3d at 269; *Ross v. New York City Dep't of Educ.*, 935

F. Supp. 2d 508, 519 (E.D.N.Y. 2013).  This Court will look, then, to whether Plaintiffs' Union

activity concerned the terms and conditions of employment and was in essence a personal

grievance, even where it affected multiple employees.

Turning first to Payson, she provides two instances of Union activity.  In terms of the

snow day grievance, Payson's only involvement was that she was "very vocal about not

withdrawing it." (Payson Dep. at 209).  The snow day grievance, in essence, concerned days

worked and compensation.  An employee's compensation and the hours an employee works are

by nature personal employment disputes and are not matters of public concern. *See Jackler v.*

*Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("Speech that, although touching on a topic of general

importance, primarily concerns an issue that is 'personal in nature and generally related to [the

speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address

matters of public concern.").  The fact that others were involved in the snow day grievance

makes it no less personal in nature. *See Lynch*, 811 F.3d at 581-82; *see also Van Compernolle*,

241 F. App'x at 250 ("A group effort to gain more overtime is no less an internal personnel

dispute than if it were the effort of one [employee].").  Similarly, the morale survey sought to

improve the relationship between staff and administration.  Assessing overall morale in attempt

to improve employees' relationship with management is an issue that relates to the conditions of

employment. *See Connick*, 461 U.S. at 141, 148, 151 (finding that "questionnaire soliciting the

views of [plaintiff's] fellow staff members concerning . . . office morale" did "not fall under the rubric of matters of 'public concern'" and was "most accurately characterized as an employee grievance concerning internal office policy."). Payson's Union activity thus did not raise matters of public concern.

Tyler acted as Vice President of the Union, which differentiates her from Payson. Nevertheless, her role as a Union representative does not entitle her to blanket First Amendment protection. *See Lynch*, 811 F.3d at 581-82, and n.13; *see also Bennett v. Lucier*, No. 1:07-CV-308 GLS RFT, 2010 WL 5138393, at *7 (N.D.N.Y. Dec. 9, 2010) ("[C]ourts must 'closely examine references to union activity . . . in order to determine whether the speech actually touches on a matter of public concern.'"); *Larsen v. Lynch*, No. CIVA3:95CV302 (AWT), 1998 WL 229919, at *3-4 (D. Conn. Mar. 31, 1998) (speech as president of the union was not matter of public concern where plaintiff filed union grievances only on his own behalf and on behalf of his sister); *Heil v. Santoro*, No. 94 CIV. 9109 BDP, 1997 WL 102451, at *4 (S.D.N.Y. Feb. 28, 1997) ("An employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law."), *aff'd*, 147 F.3d 103 (2d Cir. 1998). To determine whether Tyler's conduct related to matters of public concern or had a "strong flavor of personal grievance," the Court will look to whether her advocacy was for her own benefit, even if it also benefitted other Union members. *See Lynch*, 811 F.3d at 581; *cf. Bennett*, 2010 WL 5138393, at *1-2 (plaintiff's advocacy as a union representative was for the benefit only of another union member).

Like Payson, Tyler had a personal stake in the snow day grievance and the staff morale survey, as both affected her, as a teacher. By engaging in that activity, she did not advocate solely as a Union representative on behalf of the other Union members, but also for her own benefit. Similarly, Tyler's e-mail to the Union President questioning whether it was appropriate

for employees to work beyond their contractual hours on a professional development workshop affected her personally, as well as other teachers. Indeed, whether she had completed the professional development work became a point of contention between Tyler and Gaudette, which indicates her personal interest in the matter. (Tyler Dep. at 174-79; Gaudette Dep. at 269-76). Moreover, her question regarding the requirements for the professional development workshop, like the snow day grievance and the morale survey, did not touch on matters of public concern, and, although it was a question that affected numerous employees, was personal in nature. *See Jackler*, 658 F.3d at 236 (noting that speech regarding an employee's assignments is not a matter of public concern). Because such Union activities related to internal disputes about the terms and conditions of employment, and because Tyler, although serving as a Union representative, also had a personal interest in the outcome of her actions, the Court finds that Tyler's above advocacy, on behalf of the Union and its members, was not a matter of public concern. *See Lynch*, 811 F.3d at 581.

Tyler's role in accompanying an employee to complete a workers' compensation claim and attending a subsequent related meeting as the employee's Union representative, however, did not affect her personally. Cases such as *Pekowsky* and *Bennett* suggest that union representation of another employee, on a matter which did not affect the union representative individually, may be a matter of public concern. *Pekowsky*, 23 F. Supp. 3d at 277-78 (union activity included, *inter alia*, representing other teachers at a meeting regarding conflicts with management); *Bennett*, 2010 WL 5138393, at *1-2 (plaintiff represented and advocated for another teacher, whom he believed had been mistreated). In *Pekowsky*, the court noted that "[u]nion representation of teachers is a matter of importance to the functioning of our public education system," and was therefore a matter of public concern. 23 F. Supp. 3d at 277. The *Pekowsky* court went on to note that plaintiff's "advocacy on behalf of fellow teachers was not aimed at redressing his own

grievances, but was undertaken as a representative of the teachers' union." *Id.* at 278.   Similarly, the court in *Bennett* observed that plaintiff "was acting in his capacity as a union official on behalf of [another employee], and was not seeking to redress personal grievances or to enhance his own employment conditions." 2010 WL 5138393, at *7.   Here, as in *Pekowsky* and *Bennett*, Tyler accompanied Bruce solely in her capacity as her Union representative, and had no personal stake or interest in the outcome of Bruce's workers' compensation claim.   The Court finds that Tyler's Union representation of another employee on a matter in which she had no personal interest "invokes basic aspects of the right to unionization," and is therefore a matter of public concern. *Lynch*, 811 F.3d at 581.

Having found that Tyler's conduct in assisting Bruce qualifies as protected Union activity under the First Amendment, the Court must next determine whether she suffered an adverse consequence "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik*, 464 F.3d at 225 (citation and quotation marks omitted).   Defendants maintain that Tyler did not suffer an adverse employment action. Specifically, they argue that the dissolution of her class, her reassignment to the IAES Program and undergoing a Section 913 evaluation were not adverse employment actions because they did not "materially alter the terms and conditions of her employment."[34] (Def. Br. at 22).   In response, Tyler argues that in addition to the conduct described above, she suffered further adverse employment actions when (i) other employees were asked to submit statements about her; (ii) she was asked to return to school under the Strategic Improvement Plan, which her medical professionals advised against; and (iii) she had to use 130 days of sick leave. (Pl. Br. at

---

[34] Whether an action materially altered the terms and conditions of a plaintiff's employment is not the right standard in a First Amendment retaliation claim, *Zelnik*, 464 F.3d at 225, although it does apply to a claim for retaliation under the Rehabilitation Act, as will be discussed *infra* Section III(C)(4).

23).  Without ruling on Tyler's other allegations of retaliation, the Court finds that the sudden

disbanding of her class and the subsequent two weeks, approximately, during which she was left

with no students and no assignment, could "deter a similarly situated individual . . . from

exercising his or her constitutional rights." *Zelnik*, 464 F.3d at 225; *see also Kelly*, 675 F. Supp.

2d at 296 ("[I]n the education context, '[a]dverse employment actions may include negative

evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class

preparation periods, failure to process teacher's insurance forms, transfer from library to

classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which

aggravated teacher's physical disabilities.'") (quoting *Zelnik*, 464 F.3d at 226).  A reasonable

factfinder could therefore conclude that Tyler suffered an adverse employment action to maintain

a First Amendment retaliation claim.

Finally, the Court must assess whether Tyler can demonstrate a causal link between her

protected activity and the adverse employment action.  Tyler accompanied Bruce while she

completed a workers' compensation form on March 3, 2014.  The next week, on March 13,

2014, Tyler went with Bruce, as her Union representative, to a meeting with Gaudette.  That

same day, after Tyler went to Bruce's meeting, Gaudette disbanded Tyler's class.  The Court

finds that this temporal proximity is sufficient, such that a reasonable factfinder could infer a

causal link between Tyler's protected activity and the adverse employment action. *See, e.g.*,

*Zehner*, 666 F. App'x at 32 (finding that summary judgment on the element of causation was

inappropriate when "not even a month" had passed between the protected activity and the

adverse employment action.).  Tyler has thus established a prima facie claim for First

Amendment retaliation based on her Union representation of another employee.

Defendants attempt to establish a defense pursuant to *Mt. Healthy*, 429 U.S. at 287, and

argue that they would have taken the same actions against Tyler even if she had not engaged in

protected activity. Specifically, Defendants argue that Tyler's "conflicts with staff and students were not dissipating," and that Gaudette "had to take some action to change the environment and protect the students' and staff's well-being." (Def. Br. at 23). Despite Defendants' attempted *Mt. Healthy* defense, "'if there are significant questions as to whether an employer would have [taken the same action against] an employee but for his/her speech, summary judgment is precluded.'" *Pekowsky*, 23 F. Supp. 3d at 280 (alteration in original) (quoting *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir. 2000)). On the record before the Court, a reasonable factfinder could conclude that Tyler's class would not have been disbanded but for her Union representation of Bruce. *See id.* Summary judgment on Tyler's First Amendment retaliation claim for her Union-related activity, limited to her Union representation of another employee, is therefore denied.

Plaintiffs also claim that they were retaliated against for exercising their First Amendment rights to association. Plaintiffs do not point to any evidence, however, that suggests they were retaliated against specifically for their Union membership, as compared to their speech or advocacy related to the Union. *See Lynch*, 811 F.3d at 583 and n.14 (finding that "[plaintiff] has made no showing that [defendant] retaliated against him *because of* his union membership, particularly as he has presented no evidence that she retaliated against any other police officer for membership or for holding office in the Union," and comparing the case to *State Emp. Bargaining Agent Coalition v. Rowland*, 718 F.3d 126, 130 (2d Cir. 2013), "in which plaintiffs claimed that the state employer terminated approximately 2,800 unionized state employees, but no non-union workers."). As such, Plaintiffs' claims for retaliation in violation of their First Amendment rights to association fail as a matter of law.

## C. Retaliation in Violation of the Rehabilitation Act[35]

### 1. Standard

Section 504 ("Section 504") of the Rehabilitation Act states, in relevant part, that "[n]o

otherwise qualified individual with a disability in the United States . . . shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance[.]" 29 U.S.C. § 794(a).  While the Act serves to protect individuals with disabilities, it

"extends its remedies to 'any person aggrieved' by the discrimination of a person on the basis of

his or her disability. . . . [T]he use of such broad language in the enforcement provisions of the

statutes 'evinces a congressional intention to define standing to bring a private action under

[Section] 504 . . . as broadly as is permitted by Article III of the Constitution.'" *Innovative*

*Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997), *recognized as*

*superseded on other grounds by Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 (2d Cir.

2001) (citing 29 U.S.C. § 794(a)(2), other citations omitted).

The parties do not dispute that Plaintiffs have standing under the Rehabilitation Act to

bring retaliation claims.  Both parties cite to *Stahura-Uhl*, in which the court noted that there was

"no dispute that [plaintiff], as a special education teacher advocating on behalf of her disabled

students, is protected under the Rehabilitation Act." 836 F. Supp. 2d at 143 n.8.  In *Stahura-Uhl*,

---

[35] A party may bring a parallel and concurrent Section 1983 claim under the Rehabilitation Act. *Stahura-Uhl*, 836 F. Supp. 2d at 146; *see also Williams v. City of New York*, 121 F. Supp. 3d 354, 371 (S.D.N.Y. 2015).  However, Plaintiffs do not make clear whether, in addition to the claims under the Act itself, they are also bringing claims pursuant to Section 1983. (*Compare* FAC ¶ 1, *with* Payson's and Tyler's first claims, FAC at 19, 21).  Plaintiffs' Opposition further confuses the issue: while discussing qualified immunity under Section 1983, Plaintiffs acknowledge that "a number of District Courts in this Circuit have held that there is no individual liability under the Rehabilitation Act," suggesting that they did intend to bring Section 1983 claims under the Act. (Pl. Br. at 28 n.8). However, Plaintiffs then direct their argument to "the federal constitutional claims" related to the First Amendment. (*Id.* at 29).  Because Plaintiffs do not explicitly bring Section 1983 claims for alleged violations of the Rehabilitation Act, and because Plaintiffs' argument regarding qualified immunity under Section 1983 focuses on their First Amendment claims, the Court assumes that Plaintiffs brought claims only under the Rehabilitation Act, and did not bring parallel and concurrent claims under Section 1983.

the plaintiff had advocated that, *inter alia*, her special education students were denied necessary equipment and resources as mandated by state and federal law, that students' IEPs were not followed and were modified without hearings, that requests for aides were denied, that aides were improperly removed, and that taking special education students from self-contained classes and mixing them with regular education students was improper. *Id.* at 135-36 and n.2. Other courts have likewise found that teachers who advocate on behalf of special education students have standing under the Rehabilitation Act. *See, e.g., Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824-26 (9th Cir. 2009) (special education teacher who advocated that office of education was not complying with federal and state law requirements in its provision of services to disabled students had standing under the Rehabilitation Act); *Volpe v. New York City Dep't of Educ.*, 195 F. Supp. 3d 582, 597 (S.D.N.Y. 2016) (special education teacher engaged in protected activity under the Rehabilitation Act when she advocated regarding the school's failure to properly evaluate special education students and provide support to certain special education students, and when she attempted to contact parent of a special education student who had been removed from her classroom); *Felton v. Katonah Lewisboro Sch. Dist.*, No. 08 CIV. 9340 (SCR), 2009 WL 2223853, at *6 (S.D.N.Y. July 27, 2009) (special education teachers who advocated to management regarding, *inter alia*, the lack of supplies and insufficient IEPs for their special education students had standing under the Rehabilitation Act). The Court therefore finds that Plaintiffs have standing to bring retaliation claims under the Rehabilitation Act.

"The elements required to state a claim for retaliation under Section 504 of the Rehabilitation Act are similar to the elements under a First Amendment retaliation claim[.]" *Stahura-Uhl*, 836 F. Supp. 2d at 143. To succeed on a prima facie retaliation claim under the Act, a plaintiff must show that "(i) [she] was engaged in a protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or

course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."[36] *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002). At the prima facie stage, the plaintiff's "burden . . . is *de minimis*." *Treglia*, 313 F.3d at 719. When a plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id.* at 721.

As a preliminary matter, Defendants correctly note that Section 504 does not provide for liability against individually-named defendants sued in their individual capacities. *See MC v. Arlington Cent. Sch. Dist.*, No. 11-CV-1835 CS, 2012 WL 3020087, at *9 n.18 (S.D.N.Y. July 24, 2012) ("To the extent [p]laintiffs attempt to bring their claims against the individually-named [d]efendants in their individual capacities, they may not do so, as . . . Section 504 [does not] provide[] for individual liability.") (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)). Plaintiffs' Rehabilitation Act claims against Gaudette and Baron in their individual capacities thus fail as a matter of law.

Defendants further argue that, under the Rehabilitation Act, Plaintiffs may only sue Gaudette and Baron in their official capacities for injunctive relief, and not for monetary damages. (Def. Br. at 9). Whether individuals can be sued in their official capacities for damages under the Rehabilitation Act remains "unsettled" in the Southern District.[37] *Holly v. Cunningham*, No. 15-CV-284 (KMK), 2016 WL 8711593, at *4 (S.D.N.Y. June 17, 2016)

---

[36] Retaliation claims under the Rehabilitation Act are subject to the same standard as retaliation claims under the Americans with Disabilities Act ("ADA"). *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

[37] The Court notes that monetary damages "are recoverable only upon a showing of an intentional violation." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).

("Numerous courts in the Second Circuit have held that the ADA and Rehabilitation Act do not provide for liability against individual defendants in their official capacities. . . . Yet, others have reached the contrary conclusion.") (collecting cases).

Regardless, Plaintiffs' Rehabilitation Act claims against Gaudette and Baron in their official capacities are identical to and duplicative of Plaintiffs' claims against the BOE—which, as the named governmental entity of which Baron and Gaudette are agents, is the real party in interest.[38] *See A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 678 (E.D.N.Y. 2012) ("To the extent that the plaintiffs bring claims under [the Rehabilitation Act] against the individually named defendants in their *official capacities*, these claims are merely duplicative of the claims against the [New York City Department of Education], the 'real party in interest.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)), *aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013). "[C]laims [under the Rehabilitation Act] against officials in their official capacities are properly dismissed as duplicative of claims against the public entity itself, if named as a defendant." *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 CS, 2012 WL 2719663, at *9 (S.D.N.Y. July 9, 2012); *see also Kane v. Carmel Cent. Sch. Dist.*, No. 12 CV 5429 VB, 2014 WL 7389438, at *10 n.8 (S.D.N.Y. Dec. 15, 2014) ("[P]laintiff's claims against the [i]ndividual [d]efendants in their official capacities are redundant to her claims against the [d]istrict, and must be dismissed."). Accordingly, the Court dismisses Plaintiffs' Rehabilitation Act claims against Gaudette and Baron in their official capacities as duplicative of Plaintiffs' claims against the BOE.

---

[38] The parties do not dispute that it was appropriate to name the BOE, rather than, for example, the District, as a governmental entity Defendant in this case.

## 2. Payson

Payson's advocacy on behalf of special education students is described *supra* Sections I(A)(2)(i) and III(B)(1)(ii).  Her advocacy began in September of 2013 and continued through May 2014.  Specifically, in September 2013, she advocated to Gaudette that certain students would be best served by remaining in self-contained classes, and that counselors should be assigned to one specific class.  In October 2013, she advocated to Baron on behalf of K.J., whom she believed had been placed at the wrong school based on the student's assessment.  Also in the fall of 2013, she advocated to Baron on behalf of another student whom she believed was placed at the wrong school, and advocated to Gaudette on behalf of J.J, who had been suspended and was then placed in ninth grade without completing eighth grade.  In March 2014, Payson advocated to Baron and Gaudette regarding M.M., who had been placed in eighth grade after Tyler's sixth grade class was disbanded.  Also in March 2014, Payson filed complaints against Gaudette and Baron with the New York State Office of the Professions.  In June 2014, Payson filed complaints with the NYSED regarding J.J. and M.M.  Gaudette was made aware of the complaints to the NYSED later in June or July 2014.

Payson alleges that retaliation against her began in February 2014.  According to Payson, in February 2014, Gaudette required her to do additional work and prevented her from accessing information about students that was necessary to do her job.  Between March and April 2014, Payson's internship-related responsibilities were taken away, and in April 2014, many of her guidance counselor responsibilities were removed.  By the end of May 2014, Payson learned that her position had been reduced to 0.15 FTE.  Finally, in September 2014, Payson's position was eliminated entirely.

### 3. Tyler

Tyler's advocacy on behalf of her special education students is described *supra* Sections I(A)(3)(i) and III(B)(1)(iii). She first advocated to Gaudette in November 2011 that her students were not receiving adequate counseling, in violation of their IEPs. Also in November 2011, she voiced concerns to Gaudette that that one of her students had an inappropriate relationship with a former teaching assistant. In January 2012, she advocated to Gaudette on behalf of K.C., one of her students whom she believed should not be moved out of her classroom. Nearly one year later, in December 2012, she advocated to Gaudette that her class was not in compliance with the required ratio of students to teachers to aides. Finally, just over one year after that, in February 2014, she advocated to residential staff on behalf of her student, J.A., whom she believed needed help.

Tyler claims that she was retaliated against in February 2014 for her advocacy on behalf of J.A. Tyler received a letter of counsel from Gaudette, which advised her that she should not return to the residential area, and that any future concerns should be addressed to a student's counselor, the dean of students or the principal. In March 2014, Tyler's class was disbanded. Tyler was without an assignment for roughly two weeks; she was eventually reassigned to the IAES program. Thereafter, she was placed on administrative leave in May 2014 and was subject to a Section 913 evaluation. She was asked to return to work in September 2014, but instead returned in April 2015. She was required to use 130 sick days from July 2014 until she returned in April 2015.

### 4. Application

The Court looks first to whether Plaintiffs' advocacy on behalf of special education students was protected activity. Although Plaintiffs claim that their advocacy is protected activity, they offer only the broad claim that "there is no question that the advocacy . . . is

51

protected activity under Section 504 of the Rehabilitation Act." (Pl. Br. at 18-19).  Plaintiffs rely

solely on *Stahura-Uhl*, in which the parties did not dispute that plaintiff's conduct was protected

activity, and the court therefore did not analyze that prong. 836 F. Supp. 2d at 143.

      Defendants argue that Plaintiffs' advocacy was not protected activity because Plaintiffs

advocated against placing students in the least restrictive environment, which Defendants claim

was contrary to federal law. (Def. Br. at 14-15). *See also T.M. ex rel. A.M. v. Cornwall Cent.*

*Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) ("After considering an appropriate continuum of

alternative placements, the school district must place each disabled child in the least restrictive

educational environment that is consonant with his or her needs.").  Plaintiffs dispute

Defendants' characterization of Plaintiffs' advocacy and argue that, "to the extent that any of the

Plaintiffs' advocacy related to favoring a more restrictive environment for any particular child,

such advocacy was not in violation of law." (Pl. Br. at 19-20).  Defendants' argument asks the

Court to engage in a fact-specific analysis of the educational merits of the measures advocated

by Plaintiffs in order to determine whether Plaintiffs' advocacy constituted protected activity

under Section 504 of the Rehabilitation Act. *See P. ex rel. Mr. & Mrs. P. v. Newington Bd. of*

*Ed.*, 546 F.3d 111, 113 (2d Cir. 2008) ("[D]etermining whether a student has been placed in the

'least restrictive environment' requires a flexible, fact-specific analysis[.]").  However,

Defendants offer little legal or factual support for their argument.  Based on the evidence within

the parties' submissions, and drawing all reasonable inferences in favor of Plaintiffs, the Court is

unable to find at this stage that Plaintiffs' advocacy violated the requirement that each student be

placed in the least restrictive educational environment that is consonant with his or her needs.

      The record does, however, contain evidence supporting a finding that Plaintiffs engaged

in protected activity.  Seeking a reasonable accommodation for a disability constitutes protected

activity under Section 504 of the Rehabilitation Act. *Weixel*, 287 F.3d at 149.  "[A] non-disabled

individual who files a complaint of disability discrimination is engaging in protected activity[.] . . . Moreover, it is clear that informal complaints to management are considered protected activity under the Rehabilitation Act[.]" *Volpe*, 195 F. Supp. 3d at 596. Indeed, case law indicates that advocacy on behalf of special education students is protected activity under the Rehabilitation Act. *See id.* at 597 (advocacy regarding evaluation of and support for special education students was protected activity, as was an attempt to contact a parent of a special education student who had been removed from plaintiff's classroom); *Stahura-Uhl*, 836 F. Supp. 2d at 135-36 and n.2 (the parties agreed that advocacy regarding lack of equipment and resources for special education students, as well as failure to follow IEPs and removing students from self-contained classes was protected activity). With the exception of Tyler's advocacy to Gaudette regarding a student who had an inappropriate relationship with a former teaching assistant, all of Plaintiffs' advocacy sought to ensure that special education students were not denied the benefits of public education, and is in line with what courts have found to be protected activity. *See Weixel*, 287 F.3d at 148. Therefore, Plaintiffs' advocacy, except for Tyler's advocacy regarding the relationship between her student and the teaching assistant, was protected activity. Plaintiffs have thus met the first prong of a retaliation claim under the Rehabilitation Act.

The Court must next consider whether Defendants had knowledge of Plaintiffs' advocacy. Payson advocated directly to Baron and to Gaudette, which implicates their knowledge. Even though Gaudette did not learn about Payson's complaints to the NYSED until June 2014, Payson had advocated directly to Gaudette regarding the two students who were the subject of those complaints months earlier, which, again, indicates his knowledge of her advocacy. Turning to Tyler, she advocated primarily to Gaudette, but also to a residential staff member regarding J.A. However, it is clear from the evidence that Gaudette learned of Tyler's

advocacy regarding J.A., as she met with him about it several days after it occurred. It is thus apparent that Gaudette had knowledge of Tyler's advocacy.

The third prong requires showing an adverse employment action, which is described in the context of a Rehabilitation Act retaliation claim as a "materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia*, 313 F.3d at 720. The Second Circuit has noted that this standard is "more demanding" than the one applied in First Amendment retaliation claims. *Zelnik*, 464 F.3d at 225. "A 'materially adverse action' is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Volpe*, 195 F. Supp. 3d at 592 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Kane*, 2014 WL 7389438, at *8 (noting that an adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" and includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

Defendants do not dispute that Payson suffered an adverse employment action. Indeed, the reduction of her position and the eventual elimination of her position are adverse employment actions.[39] *See Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp., v. Morgan*, 536 U.S. 101, 122 (2002). Defendants contest, however, that Tyler suffered an adverse employment action. As

---

[39] Having found that Payson was subject to these adverse employment actions, the Court will not decide, at this time, whether her other claims of retaliation—such as the removal of her internship responsibilities or the reduction of her guidance counselor duties—constitute adverse employment actions. The Court notes, however, that "a change in working conditions must be more disruptive than a mere . . . alteration of job responsibilities." *Weeks*, 273 F.3d at 85.

discussed *supra* Section III(B)(2)(iv), and without ruling on Tyler's other claims of retaliation,[40] the Court finds that abruptly disbanding Tyler's class and the subsequent time she spent without an assignment were adverse employment actions, even under this more demanding standard. A primary responsibility of a teacher is to teach students, and Tyler had no students after her class was disbanded and she was without an assignment; therefore, her "material responsibilities" were "significantly diminished," and the "terms and conditions of her employment" were affected.[41] *Weeks*, 273 F.3d at 85, 87; *see also Volpe*, 195 F. Supp. 3d at 597 (comparing demotions to "mere reassignments," citing *Weeks*, 273 F.3d at 86 (demotions), and *Davies v. N.Y.C. Dep't of Educ.*, 563 Fed. App'x 818, 820 (2d Cir. 2014) (reassignments)). Moreover, such a consequence "could conceivably have dissuaded a reasonable employee from advocating on behalf of special education students." *Volpe*, 195 F. Supp. 3d at 598. Based on the foregoing, there is at least a genuine issue of material fact as to whether Tyler suffered an adverse employment action, and both Plaintiffs have thus satisfied the third prong of a prima facie retaliation claim under the Rehabilitation Act.

Finally, to establish a causal connection, "a plaintiff must allege that the protected activity was a substantial motivating factor in the adverse employment action." *Stahura-Uhl*, 836 F. Supp. 2d at 143 (citing *Cioffi v. Averill Park Cent. Sch. Dist.*, 444 F.3d 158, 167 (2d Cir.

---

[40] The Court notes that, under the Rehabilitation Act, actions such as "criticizing an employee in the course of evaluating and correcting her work," "a negative evaluation letter" and "excessive scrutiny not connected to a particular change in the terms and conditions of employment" do not, by themselves, constitute "an adverse action in the context of retaliation claims." *Volpe*, 195 F. Supp. 3d at 597. The Court further notes that a Section 913 examination and Tyler's paid leave of absence are unlikely to constitute adverse employment actions. *See Kane*, 2014 WL 7389438, at *8-9.

[41] In the context of the Age Discrimination in Employment Act and other similar statutes, the "Second Circuit has found that diminished work responsibilities may constitute adverse employment action where 'it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career,' . . . or where an employee is given 'profoundly different' responsibilities that represent 'a severe professional . . . trauma.'" *Spinelli v. City of New York*, No. 13-CIV7-112(GBD)(SN), 2016 WL 5476001, at *3 (S.D.N.Y. Sept. 29, 2016) (collecting cases). "A plaintiff may show an adverse employment action either where she is transferred to a new position with diminished work responsibilities, or where she retains the same position only in name." (*Id.*).

2006)); *see also Volpe*, 195 F. Supp. 3d at 597. As in the First Amendment retaliation context, "[a] plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision." *Stahura-Uhl*, 836 F. Supp. 2d at 143; *see also Treglia*, 313 F.3d at 720 ("[A] close temporal relationship . . . can be sufficient to establish causation."). While a "few months" may be sufficient to show causation, *see Treglia*, 313 F.3d at 720-21, the Supreme Court has noted, in the context of Title VII, that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'" *Clark*, 532 U.S. at 273 (action taken twenty months after protected activity "suggests, by itself, no causality at all.").

Payson's advocacy began in September 2013 and continued through that school year, until May 2014. The last time Payson advocated to Baron or Gaudette about an individual student was in March 2014, when she advocated that M.M.'s placement in a class with students more than three years apart in age was contrary to law. For the purposes of this Motion, the Court will look only to Payson's last act of advocacy to Baron or Gaudette, and will assume that the reduction of her position to 0.15 FTE in May 2014 was the first adverse employment action taken against her.[42] The Court finds that the two month temporal proximity between the advocacy and the adverse employment action is sufficient for a reasonable factfinder to find causation. *See Graham v. Macy's, Inc.*, No. 14 CIV. 3192 (PAE), 2016 WL 354897, at *9 (S.D.N.Y. Jan. 28, 2016) (noting in ADA retaliation claim that, although "the Second Circuit 'has not drawn a bright line defining . . . the outer limits beyond which a temporal relationship is

---

[42] Although the PERB decision found legitimate business reasons for the decision to reduce Payson's position, that decision did not consider any of her advocacy on behalf of students, nor did it consider the eventual elimination of her position. As discussed *supra* Section III(A), the decision does not have preclusive effect on her claim regarding advocacy on behalf of students.

too attenuated to establish causation,' . . . courts in this Circuit generally hold that a gap longer than two months severs the inferred causal relationship."), *aff'd*, 675 F. App'x 81 (2d Cir. 2017).

Although Tyler appears to characterize the disbanding of her class in March 2014 as retaliation for her March 2014 Union activity, (Def. Br. at 17), Tyler's advocacy to residential staff regarding her student, J.A., which Gaudette was aware of, took place only one month prior to the dissolution of her class. The temporal proximity between Tyler's advocacy on behalf of J.A. and the disbanding of her class is thus sufficient to establish a genuine issue of material fact as to causation at this stage.[43] *See Treglia*, 313 F.3d at 721 (one month was sufficient to establish causation for a prima facie case).

Plaintiffs have thus established a prima facie case of retaliation under the Rehabilitation Act. In response, Defendants advance the following non-retaliatory reasons for their actions: (i) regarding Payson, Defendants contend that Gaudette had "a clear plan to restructure the Guidance Department when he began his tenure;" (ii) regarding Tyler, as discussed *supra* Section III(B)(2)(iv), Defendants argue that "her conflicts with staff and students" required Gaudette to "take some action." (Def. Br. at 23). Even assuming that these are legitimate, non-retaliatory reasons, there is evidence in the record from which a reasonable factfinder could conclude that the reasons are "merely a pretext for impermissible retaliation." *Treglia*, 313 F.3d at 721. Payson points to evidence—including testimony from the District's Chief Financial Officer and from the Director of Special Education Fiscal Services for the NYSED—that calls into question the legitimacy of Gaudette's decisions pertaining to the District's budget and the reduction and elimination of Payson's position. (Pl. Br. at 21-22). While Tyler does not specifically point the Court to any evidence that would allow a reasonable factfinder to

---

[43] The Court notes that Tyler's earlier advocacy on behalf of her students was likely too far removed temporally from the dissolution of her class to serve as the only evidence of causation. *See Clark*, 532 U.S. at 274.

determine that Defendants' reasons were pretextual, there is such evidence in the record.  For example, Baron, as principal of Tyler's school, did not learn that Gaudette was disbanding Tyler's sixth grade class until the day it was disbanded, when Gaudette "walk[ed] past [Baron] and sa[id] something to the effect that the class has to be disbanded now[,] [s]he's very upset, we have to disband the class." (Baron Dep. at 122).  Viewing the evidence in the light most favorable to Plaintiffs as the parties opposing summary judgment, the Court finds that a reasonable factfinder could determine that Defendants' reasons for the adverse employment actions were "pretextual explanations meant to hide [their] unlawful motive." *Treglia*, 313 F.3d at 721.  The Court therefore denies summary judgment on Plaintiffs' claims for retaliation under the Rehabilitation Act.

## D. Retaliation in Violation of New York Civil Service Law Section 75-b

Payson claims that she was retaliated against in violation of Section 75-b of the New York Civil Service Law for filing complaints with the NYSED in June 2014.[44]  Although her position had been reduced to 0.15 FTE prior to filing the NYSED complaints, she claims that the elimination of her position in September 2014 was in retaliation for the complaints.  Defendants argue, without citing to any law, that Payson cannot show a causal connection between filing the complaints and the elimination of her position and that her claim should therefore fail as a matter of law.

## 1. Standard

Section 75-b is a state whistleblower statute which "provides that adverse employment action may not be taken against a public employee based upon his or her disclosure of information [to a governmental body] 'which the employee reasonably believes to be true and

---

[44] To the extent Payson also claims that these complaints, and the letter she sent to the BOE, are protected by the First Amendment, those claims fail as a matter of law, as discussed *supra* Section III(B)(1)(iv) and n.30.

reasonably believes constitutes an improper governmental action.'" *Tipaldo v. Lynn*, 26 N.Y.3d 204, 210-11 (2015) (quoting N.Y. Civ. Serv. Law § 75-b(2)(a)). "In order to state a retaliation claim under Section 75-b, a plaintiff must allege (1) an adverse personnel action; (2) disclosure of information to a governmental body [regarding an improper governmental action], and (3) a causal connection between the disclosure and the adverse personnel action." *Krzesaj v. New York City Dep't of Educ.*, No. 16 CIV. 2926 (ER), 2017 WL 1031278, at *11 (S.D.N.Y. Mar. 15, 2017). An "[i]mproper governmental action" is conduct "which is in violation of any federal, state or local law, rule or regulation." N.Y. Civ. Serv. Law § 75-b(2)(a)(ii).

"As an initial matter, claims under [Section] 75-b cannot be maintained against individual public employees." *Eyshinskiy v. New York City Dep't of Educ.*, No. 15 CIV. 10027 (DLC), 2016 WL 7017414, at *2 (S.D.N.Y. Dec. 1, 2016), *aff'd sub nom. Eyshinskiy v. Kendall*, No. 16-4210-CV, 2017 WL 2829682 (2d Cir. June 30, 2017); *see also Krzesaj*, 2017 WL 1031278, at *11; *Moore v. Cty. of Rockland*, 596 N.Y.S.2d 908, 911 (3d Dep't 1993) ("Moreover, as Civil Service Law § 75-b applies only to retaliatory discharges by public employers, not to actions by fellow public employees[,] the cause of action for violation of Civil Service Law § 75-b may not be maintained against the individual defendants.") (citing N.Y. Civ. Serv. Law § 75-b(2)(a)); N.Y. Civ. Serv. Law § 75-b(1)(a) (defining "public employer"). Payson's Section 75-b claims against Baron and Gaudette thus fail as a matter of law.

The parties have not taken a position on whether Payson has standing to bring a claim for retaliation under Section 75-b. "Where an employee is subject to a collectively negotiated agreement which contains provisions preventing an employer from taking adverse personnel actions,' and which contains a binding arbitration provision for all such allegations, the employee shall grieve his claims and may assert them only before an arbitrator. . . . Thus, only those employees not party to a collective bargaining agreement may file suit in federal court to

enforce their rights under Section 75-b." *Krzesaj*, 2017 WL 1031278, at *11 (quoting N.Y. Civ. Serv. Law § 75-b(3)(b)); *see also, e.g.*, *DiGregorio v. MTA Metro-N. R.R.*, 35 N.Y.S.3d 11, 12 (1st Dep't 2016). Plaintiffs have indicated that a collective bargaining agreement was in place (*see, e.g.*, Tyler Dep. at 270-72) and, as a member of the Union, Payson was likely subject to it. However, the parties have not provided the Court with a copy of the collective bargaining agreement, nor have they indicated whether it contains "a final and binding arbitration provision to resolve alleged violations of [provisions preventing an employer from taking adverse personnel actions]." N.Y. Civ. Serv. Law § 75-b(3)(b). Viewing all facts in favor of Payson as the party opposing summary judgment, the Court will assume, for the purposes of this Motion, that she was not subject to such a collective bargaining agreement. However, the Court leaves open the possibility that, under the collective bargaining agreement, Payson's claim under Section 75-b may fail as a matter of law.

## 2. Application

Payson has established the first two elements for a claim of retaliation under Section 75-b. First, she suffered an adverse personnel action when her position was eliminated. A personnel action is one that affects, *inter alia*, compensation, appointment and assignment. N.Y. Civ. Serv. Law § 75-b(1)(d). The elimination of her position affected her compensation, appointment and assignment. Second, she disclosed information to a governmental agency, the NYSED, which she reasonably believed was true, and which she reasonably believed constituted an improper governmental action—that is, an action that violated federal, state or local law, rules or regulations. *See* N.Y. Civ. Serv. Law § (2)(a). In two separate complaints to the NYSED, both dated in June 2014, Payson filed allegations regarding J.J., M.M. and the District's change of classroom ratios on students' IEPs. The NYSED sustained four of Payson's five allegations

as contrary to New York Codes, Rules and Regulations.  This supports the reasonableness of her beliefs.

Turning to the third factor, whether there is a causal connection between Payson's disclosure and the elimination of her position, Payson relies only on temporal proximity.  While Gaudette was made aware of Payson's complaints in June 2014, her position was not eliminated until three months later, in September 2014.  Nevertheless, the NYSED did not sustain Payson's allegations until August 2014, one month before her position was eliminated.  The Court thus finds that a reasonable factfinder could infer causation, and summary judgment on Payson's Section 75-b claim is denied at this time. *See Jones v. Town of Whitehall*, No. 1:13-CV-0806 LEK/CFH, 2015 WL 4603511, at \*9 (N.D.N.Y. July 30, 2015) (denying summary judgment, noting that although a plaintiff "must establish that 'but for' the protected activity, the adverse personnel action . . . would not have occurred[,] . . . the true motivation behind the [d]efendants' decision to terminate [p]laintiff's employment is a genuine issue of material fact.").

## E.  Qualified Immunity

Gaudette and Baron argue that they are entitled to qualified immunity on Plaintiffs' Section 1983 claims based on the alleged First Amendment violations.  In response, Plaintiffs contend that their First Amendment rights were clearly established, and thus Gaudette and Baron are not entitled to qualified immunity.  The only First Amendment claim pursuant to Section 1983 that remains is Tyler's claim regarding her Union activity.[45]

---

[45] Defendants argue that Baron "did not make any decisions regarding the [Plaintiffs'] job duties or legal rights." (Pl. Br. at 11).  While it does not appear that Baron was involved in the decision to disband Tyler's class, the Court will nevertheless consider whether she is entitled to qualified immunity on this claim.

## 1. Standard

"Qualified immunity applies only to a plaintiff's claim against an individual state actor for damages. It has no application when the suit is brought against a municipality, nor when the suit seeks injunctive relief." *Lynch*, 811 F.3d at 579 n.11. When a plaintiff brings a claim against an individual state actor under Section 1983 for violating the plaintiff's constitutional rights, the state actor "is entitled to have the action dismissed on the basis of qualified immunity if at the time of the challenged conduct there was no 'clearly established law' that such conduct constituted a constitutional violation." *Id.* at 578 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

## 2. Application

The issue here is whether it was clearly established in March 2014, when Tyler's class was disbanded, that accompanying an employee to complete a workers' compensation form and subsequently to a meeting, as her Union representative, was protected First Amendment activity. The Court finds that it was not. First, it was not clearly established whether Tyler was acting as a private citizen or as a public employee. As the Second Circuit noted in *Lynch*, "[i]t is not clear that speech by employees in the role of union officers, involving advocacy as to the *terms and conditions of employment*, fits comfortably into either category [private citizen or public employee]."[46] 811 F.3d at 582 n.13 (emphasis in original). Although the Second Circuit suggested that *Lane* might clarify this issue, the Supreme Court did not issue its decision in *Lane* until June 19, 2014, several months after Tyler's class had been disbanded. *Id.*; *see also* 134 S. Ct. 2369 at 2369.

---

[46] The Court notes that although Tyler's Union representation of Bruce did not concern Tyler's own terms and conditions of employment, it did concern Bruce's terms and conditions of employment.

Second, it was not clear in March 2014 that Payson's activity was a matter of public concern. Despite dicta from 1999 in *Clue* that "retaliation solely for union activity clearly raises a public concern," the Second Circuit in *Clue* also "recognized that some union activity was likely unprotected from retaliation." *Lynch*, 811 F.3d at 582; *see also Clue*, 179 F.3d at 61. Although subsequent cases such as *Bennett* and *Pekowsky* found that plaintiffs who engaged in union representation of other employees raised a matter of public concern, *Bennett*, which was decided in 2010, is a case from the Northern District of New York and is not controlling, and *Pekowsky*, which is also not controlling, was decided in May 2014, two months after Tyler's class was disbanded. *See Bennett*, 2010 WL 5138393, at *7; *Pekowsky*, 23 F. Supp. 3d at 277; *see also Lynch*, 811 F.3d at 578-79 and n.8 ("[T]he need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit[.]"). Plaintiffs do not cite any law for their position that Tyler's First Amendment rights related to Union activities were "clearly established at the time of the events in question." (Pl. Br. at 29).

The Court therefore finds that it was not clear whether Tyler's Union advocacy at the time her class was disbanded was protected under the First Amendment, and Defendants Gaudette and Baron are therefore entitled to qualified immunity on this claim.

## F. Damages

The parties dispute whether Plaintiffs are entitled to punitive damages. Plaintiffs concede that punitive damages under Section 1983 are not available against municipalities or individuals sued in their official capacities. *De Michele v. City of New York*, No. 09 CIV. 9334 PGG, 2012 WL 4354763, at *22 (S.D.N.Y. Sept. 24, 2012). Because Gaudette and Baron are entitled to qualified immunity on the only remaining Section 1983 claim and are thus not liable in their individual capacities, there is no need to address punitive damages.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The claims that remain are Tyler's claim—against the BOE and, in their official capacities, Gaudette and Baron—for First Amendment retaliation based on Tyler's Union representation of another employee; both Plaintiffs' claims—against the BOE—for retaliation under the Rehabilitation Act; and Payson's claim—against the BOE—under Civil Service Law Section 75-b.  The Clerk is respectfully requested to terminate the pending motion (Docket No. 49).

Dated:    September 20, 2017
          White Plains, New York

                                        **SO ORDERED:**

                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge